**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Heritage Community Bank,** ) ) ) ) ) | |
| **Plaintiff,** ) | **Case No.** |
| **v.** ) ) | |
| **JOHN M. SAPHIR; PATRICK G. FANNING; STEPHEN L. FAYDASH; WILLIAM E. HETLER; THOMAS JELINEK; LORI A. MOSELEY; STEPHEN ANTHONY; JERRY C. BRUCER; JAMES K. CHAMPION; ANDREW B. NATHAN; and MARY C. MILLS,** ) ) ) ) ) ) ) ) | **JURY DEMANDED** |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC"), as Receiver of Heritage Community Bank, for its Complaint, states as follows:

1.      FDIC brings this case in its capacity as Receiver of Heritage Community Bank ("Heritage" or the "Bank"), pursuant to its authority granted by 12 U.S.C. § 1821.  The FDIC seeks to recover losses of at least $20 million the Bank suffered because Defendants – eleven of its former directors and/or officers (collectively, "Defendants") – failed to properly manage and supervise Heritage and its commercial real estate lending program ("CRE Lending Program").  The Complaint alleges claims of negligence, gross negligence, and breach of fiduciary duty.

2.      The seeds of the CRE Lending Program's failure (and with it, the failure of the Bank) were planted in the early 2000s, when the Program first began.  From the outset, Defendants failed to protect the Bank from the substantial inherent risks of large-scale CRE lending.  The Bank routinely financed CRE projects – including speculative ones (*i.e.,* projects without committed buyers or tenants) – without any meaningful analysis of their economic viability, and often with inadequate appraisals. It repeatedly made loans with excessive "loan-to-value" ratios, meaning the loans were too large given the value of the projects.  The Bank also failed to properly evaluate the creditworthiness of CRE borrowers and guarantors to ensure they could reliably repay their loans.  While the Bank's credit analysts should have been positioned to rigorously and objectively review proposed loans to guard against the risk of loss, Defendants failed to structure the CRE Lending Program to let the credit analysts do their job.  The credit analysts were inexperienced in banking, often entry-level employees who, as a practical matter, could not say "no"; instead of being independent, the credit analysts reported to Defendant Patrick G. Fanning, the Bank President, who had personally originated most of the CRE loans.

3.      The sheer volume of the Bank's CRE lending soon grew far too large for a bank of Heritage's size, leaving it dangerously over-exposed to the volatile CRE market. Making matters worse, Defendants failed to preserve the Bank's capital and provide sufficient reserves to absorb losses that would inevitably result when poorly underwritten CRE loans went bad.  Instead, Defendants depleted the Bank's capital by making millions of dollars in dividend payments to Heritage's holding company and paying generous incentive awards to senior management.

4.      By December 1, 2006, each Defendant knew the Bank's CRE Lending Program was failing and threatening the Bank's viability.  But instead of curtailing CRE lending, working out troubled loans, and preserving Bank capital, Defendants tried to mask the Bank's mounting problems.  They made new CRE loans and renewed and made additional loan advances on existing troubled loans, often replenishing "interest reserves," which allowed borrowers to pay interest with more borrowed funds.  As such, while the Bank recognized substantial amounts of non-cash income, the Bank's cash reserves, largely provided by customer deposits, were used to fund the payment of incentive awards and dividends, which further weakened the financial position of the Bank.

5.      Heritage failed on February 27, 2009.  As a result of Defendants' derelictions, Heritage suffered damages after December 1, 2006, of at least $20 million, including more than $8.5 million in losses on CRE Lending, and $11.075 million in unjustified dividends to the Bank's holding company and incentive compensation payments Defendants paid to themselves and others.

## THE PARTIES

### Plaintiff

6.      Plaintiff is the Federal Deposit Insurance Corporation, acting as Receiver of Heritage, pursuant to 12 U.S.C. § 1811, *et seq.*  The FDIC was appointed Receiver on February 27, 2009, following the closure of the Bank by the Illinois Department of Financial and Professional Regulation.  As Receiver, the FDIC has rights to pursue all of the Bank's claims, including its claims against each of the Defendants here.

**Defendants**

7.     Defendant John M. Saphir worked for the Bank for more than forty years, serving as its President and, later, its Chief Executive Officer and Chairman of the Board of Directors for the Bank and its holding company, Heritage Community Bancorporation, Inc. ("HCBI").  Saphir and his family trusts owned 30% of HCBI's stock, the largest single block of HCBI shares.  Saphir was also a member of the Loan Committee.  He resides in Chicago, Illinois.

8.     Defendant Patrick G. Fanning joined Heritage in late 2000, and rose to the position of Senior Vice President, and then Chief Lending Officer and President, all within a six-year period.  Fanning also was a member of the Boards of Directors of Heritage and HCBI, where he was an approximately 1% shareholder.  In addition, Fanning was the primary originator of CRE loans and the Bank's top lending officer and administrator, overseeing all origination and credit administration functions.  Fanning was also a member of the Loan Committee.  He resides in Homewood, Illinois.

9.     Defendant Stephen L. Faydash joined Heritage in 1993, and became its Chief Financial Officer.  In that capacity, he was responsible for preparing the Bank's financial statements and tax returns, as well as submitting the Bank's Quarterly Call Reports and complying with the Bank's other regulatory reporting requirements.  Faydash was an officer of Heritage and an approximately 6% shareholder of HCBI.  He resides in Oak Park, Illinois.

10.     Defendant William E. Hetler joined Heritage in 1987 as Vice President of Retail Lending, and when the Bank began to pursue CRE lending, Hetler became both Senior Vice President of Lending and the CRE Compliance Officer.  Hetler was a member of the Loan Committee.  He resides in Monee, Illinois.

4

11.     Defendant Thomas Jelinek joined Heritage in 1991, and when the Bank began to pursue CRE lending, Jelinek became a CRE Lending Officer.  Jelinek was a member of the Loan Committee.  He resides in Frankfort, Illinois.

12.     Defendant Lori A. Moseley joined Heritage in 1999, and became Vice President of Loan Operations in January 2003.  Moseley was a member of the Loan Committee.  She resides in Crown Point, Indiana.

13.     Defendant Stephen Anthony was a member of the Heritage Board of Directors beginning in 1990, and served as the Chairman of the Audit Committee.  Anthony owned .489% of HCBI.  When Anthony joined the Heritage Board, he had no significant banking experience; he was president of a manufacturing company that had a long-standing borrowing relationship with Heritage.  He resides in South Holland, Illinois.

14.     Defendant Jerry C. Brucer was a member of the Heritage and HCBI Boards of Directors, replacing his father in those positions.  Brucer, and trusts controlled by his family, owned 13.435% of HCBI.  When Brucer joined the Heritage Board, he had no significant banking experience; he owned Rosebud Farm, Inc., and had a long-standing account and borrowing relationship with Heritage.  He resides in Chicago, Illinois.

15.     Defendant James K. Champion was a member of the Heritage Board of Directors beginning in 1988.  Champion owned 1.285% of HCBI.  When Champion joined the Heritage Board, he had no significant banking experience.  He resides in Naples, Florida.

16.     Defendant Andrew B. Nathan was a member of the Heritage Board of Directors beginning in 2002, when he succeeded his father in that position.  Nathan regularly attended Heritage's weekly Loan Committee meetings, and became a voting member of the Loan Committee in 2006.  Nathan, and trusts controlled by his family, owned 9.331% of

HCBI. When Nathan joined the Heritage Board, he had no significant banking experience. He resides in Northbrook, Illinois.

17.     Defendant Mary C. Mills was a member of the Heritage Board of Directors beginning in 2002, when she succeeded her father in that position. Mills, and trusts controlled by her family, owned 12.913% of HCBI. When Mills joined the Heritage Board, she had no significant banking experience; she had formerly worked for Proctor & Gamble. She resides in Dos Peres, Missouri.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1345.

19.     The Court has personal jurisdiction over Defendants pursuant to 735 ILCS §§ 5/2-209(a)(1) and (2).

20.     Venue is proper in this District under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

21.     Heritage was founded in 1969, with its headquarters in Glenwood, Illinois, in suburban Chicago. For over thirty years, Heritage concentrated in traditional lending areas, such as student loans and home equity loans. By 2000, these lending areas slowed significantly for Heritage, and Defendants, as the Bank's leadership, searched for areas where the Bank could lend profitably. Defendants turned to commercial real estate, attracted by the high rates and short-term nature of these loans. Although Defendants were aware of the existence of a real estate "bubble," they pushed the Bank headlong into CRE lending, based on the unsupportable assumption that real estate values would rise or remain stable.

## Deficiencies in Heritage's CRE Lending Program

22.     As Defendants knew, or should have known, CRE lending is a specialized

field with unique risks that require thorough understanding and close management.

Management's ability to identify, measure, monitor, and control portfolio risk through

effective underwriting policies, systems, and internal controls is crucial to sound CRE

lending.  The Board of Directors is responsible for establishing appropriate risk limits,

monitoring exposure, and evaluating the effectiveness of an institution's efforts to manage

and control risk.

23.     Heritage's CRE Lending Program focused on commercial projects in the

greater Chicago area, such as condominium conversions, strip malls, and speculative single-

family residences.  With the exception of Defendant Fanning (who had little more than two

years of relevant experience before joining Heritage), Defendants had virtually no experience

in CRE lending and little or no idea of the risks inherent in such loans.  Yet, before

embarking on the CRE Lending Program with full force, Defendants did not consult anyone

with expertise as to how to establish, structure, or operate such a program.  As a result,

Defendants failed to implement the most basic controls to mitigate the inherent risks in CRE

loans, and the Program was marked by deficient underwriting and monitoring from the outset.

A number of these deficiencies are described below.

## CRE Loan Underwriting Deficiencies

24.     Credit analysts are the first line of defense against poor credit decisions and

generally prepare loan write-ups summarizing the proposed loan and analyzing the

creditworthiness of the borrowers and guarantors, as well as the project's feasibility.  At

Heritage, once a credit analyst prepared a loan write-up, the CRE loan would go to the Loan

Committee for approval. Thereafter, the loan write-up was approved a second time by the Board of Directors.

25.     The Heritage credit analysts, however, were entry-level employees without meaningful banking experience, and when a credit analyst was not available to analyze a proposed loan, Heritage loan officers prepared write-ups for their own loans. In either situation, Heritage's loan write-ups lacked a global analysis of the creditworthiness of prospective borrowers and/or guarantors and, in some instances, relied on unverified information provided by the borrower and/or guarantor. Each loan write-up also contained a "loan grade" to reflect the level of risk attendant to the loan. These loan grades, however, were often inflated, stating that loans had good-quality credit risk when, in fact, they did not. These inflated loan grades led the Bank to make high-risk loans to uncreditworthy borrowers, and, from their inception, to set aside insufficient reserves for these risky loans.

26.     In addition, Defendants failed to segregate the loan administration function, including credit analysis, from the Bank's loan origination function, which generated "sales" of new loans. Heritage loan officers, including Defendant Fanning, were generously compensated with incentive awards for their origination of loans, providing them with motivation to ensure that the Loan Committee and the Board of Directors approved their loans. By contrast, the loan administration function was responsible for analyzing proposed loans and monitoring them once they were made. Because the Heritage Loan Department failed to segregate these functions, loan administration employees, including credit analysts, never had the independence necessary to scrutinize loan proposals and rein in non-performing loans.

27.     For example, most of the problem CRE credits were originated by Defendant Fanning, who maintained close relationships with real estate builders and developers, many of whom repeatedly borrowed from Heritage and were related to one another.  Because Fanning was the Bank's principal CRE loan originator, the Bank's top officer, a member of the Loan Committee, and a member of the Board of Directors, CRE loans he supported received only the most cursory review.  Frequently, Fanning's unsupported belief in the borrower's ability to complete the project carried more weight than the little credit analysis that was actually performed.

28.     Heritage's CRE loans were all the more risky because the Bank often financed speculative projects without verified pre-sales.  The speculative CRE loans were largely "collateral dependent," meaning the principal source of repayment was the sale of the project. Without assurance that such sales would take place, the Bank ran the additional risk that even if projects were completed, loans might not be repaid.

29.     Heritage also extended CRE loans with excessive loan-to-value ("LTV") ratios, meaning the loan amount was dangerously close to the estimated total future value of the collateral based on an "as completed" appraisal.  For example, Heritage's own loan policy provided that CRE loans not exceed 80% of the value of the property, which was lowered to 75% when land development was involved.  Notwithstanding its policy, Heritage routinely exceeded these limits.  As a result, the borrower's equity at risk in the project was often dwarfed by the Bank's loan amount, which, consequently, meant that the Bank had the most to lose if the project was not successfully completed.

30.     When Heritage's regulators criticized the Bank for exceeding supervisory LTV limits, Defendant Saphir wrote a letter to the Illinois Department of Financial and

Professional Regulation, dated January 4, 2007, defending Heritage's practices. Saphir's letter suggested that the limitation on high-LTV loans to 100% of total Bank capital (cited in 12 C.F.R. Appendix A to Part 365) was merely "guidance," not a binding limit, and that Heritage had sufficient controls in its underwriting and loan monitoring functions to properly manage risk in its loan portfolio. In fact, such controls were insufficient to manage the risk of high-LTV loans. Moreover, the Defendants failed to ensure that the volume and amounts of such loans were accurately measured and monitored.

31.     Although Heritage's loan policy and regulatory standards required appraisals, Heritage made CRE loans on projects with patently deficient appraisals or appraisals that did not support the feasibility of the projects. Heritage received repeated regulatory criticism for non-compliance with regulatory standards relating to appraisals. Assessing the sufficiency of the collateral to support its CRE loans was particularly critical to Heritage, given that its CRE loans were largely collateral-dependent.

32.     Finally, Heritage was well known among borrowers for including generous "interest-carry" provisions in its high-risk CRE loans. These interest-carry provisions meant that the interest payments the Bank recorded as having been received from the borrower over the duration of the loan were, in fact, Bank-financed.

**CRE Loan Monitoring Deficiencies**

33.     Defendants failed to implement an effective system to monitor CRE loans to determine if the projects continued to be feasible based on their original underwriting. Unlike a typical home loan, a CRE loan requires the lender to monitor the progress of the project and determine whether the percentage of funds disbursed is consistent with the percentage of the project's completion. When these percentages are not consistent, an out-of-balance condition

occurs, and the lender must either decide to lend additional funds to cure the condition, or require borrowers to place additional funds of their own into the project. Heritage was routinely either unaware of whether loans were out of balance, or tolerated the condition without requiring additional borrower contributions, practices that made these loans even riskier.

34.     Similarly, when CRE loans began to fail, Heritage took little or no action to work out troubled loans. Heritage's tracking procedures were virtually non-existent or meaningless where they did exist, and until 2007, loan officers continued to receive incentive awards even when loans were non-performing.

35.     Not until 2008, when the Bank was on the brink of failure, did the Board commission a substantive, independent loan review to identify weaknesses in its CRE loan portfolio. Before that time, the Director Defendants hired a shareholder of HCBI to perform a document review principally of newly originated loans. Without a substantive, independent loan review, especially of more seasoned loans, the Bank lacked the professional insight and critical analyses necessary to monitor its high-risk CRE loans.

**Failure to Protect Against CRE Loan Losses**

36.     In large part because of the interest-carry provisions described in paragraph 32 above, the CRE Lending Program made the Bank appear to have rapidly rising interest income. In fact, that income was not received from borrowers making loan payments in cash, but rather was recognized by merely increasing the outstanding balance of the CRE loan by drawing down on "interest reserves" provided for in the original loan and often increased by the Bank once depleted. The Director Defendants and Faydash nonetheless used this apparent profitability to justify: (a) up-streaming Bank funds to the holding company for the

payment of substantial dividends; and (b) making generous incentive compensation payments to senior management, including hundreds of thousands of dollars paid to Defendants Saphir, Fanning and Faydash.

37.     The Director Defendants and Faydash failed to maintain sufficient reserves (known as the "Allowance for Loan and Lease Losses," or "ALLL") on CRE loans. As a result, the Bank's financial condition was impaired, and it was unable to absorb and withstand the significant losses on CRE loans when defaults on these high-risk loans began to occur.

38.     By 2002, the Bank's CRE lending had grown to $40 million, and by 2006, had exploded to $178 million. Because Heritage undertook this uncontrolled growth without increasing its capital, the June 30, 2006, Report of Examination by the Illinois Department of Financial and Professional Regulation reported that Heritage's $178 million in construction and development loans amounted to 634% of the Bank's Tier 1 capital. Yet, Defendants failed to heed regulatory criticism warning them to control their CRE lending and set appropriate limits to avoid over-concentration in this area. Instead, Defendants continued to aggressively pursue CRE lending.

### Continuation of the CRE Lending Program After December 1, 2006

39.     By the end of 2006, Heritage's CRE Lending Program was failing. The Chicago-area real estate market was in decline, and increasing numbers of Heritage's CRE loans were distressed. In each of the first three quarters of 2006, Heritage's Uniform Bank Performance Report showed the Bank in the bottom 3% to 4% of its peer group with respect to net losses for construction and land development loans. Defendants should have caused Heritage to cease new CRE lending, aggressively work out distressed loans, increase reserves, and strengthen Bank capital. Instead, Defendants caused and allowed the Bank to

make new, high-risk CRE loans and to extend, renew and make additional advances on non-performing loans to mask their problems. And instead of increasing capital and ALLL reserves, the Director Defendants, on the recommendation of Faydash, continued dividend and incentive compensation payments.

**New and Renewed CRE Loans**

40. From December 1, 2006, until the Bank's failure on February 27, 2009, the Loan Committee and the Board of Directors approved an additional $86.3 million in CRE-related loans. This new lending was subject to the same systemic, institutional failings identified above. Some of the worst of these loans approved after December 1, 2006, are shown here:

**CRE Loans Approved After December 1, 2006**

| Loan/Borrower | Date Approved | Amount of Loan | Losses as of 03-31-10 |
|---|---|---|---|
| Vlaskovic | 04-18-07 | $ 3,350,000 | $ 1,547,304 |
| 4130 S. Western LLC | 04-18-07 | 760,000 | 168,698 |
| Hershoff | 04-18-07 | 1,000,000 | 648,316 |
| 4518 N. Kedzie LLC | 05-09-07 | 4,790,000 | 2,626,462 |
| REI Berteau LLC | 06-13-07 | 3,050,000 | 1,429,272 |
| Gurvey | 06-27-07 | 2,270,000 | 710,475 |
| Decontra, Inc. | 12-19-07 | 850,000 | 358,908 |
| North American Realty | 02-06-08 | 300,000 | 201,500 |
| Letchinger (1035 North Dearborn) | 02-22-08 | 930,000 | 530,578 |
| 708 Dearborn (Latsko) | 06-10-08 | 800,000 | 315,130 |
| **Total** | | | **$ 8,536,643** |

The losses on these loans are ongoing, as loan amounts continue to be charged off. Thus, the total amount of losses, even on these loans highlighted by way of example, continue to increase.

41.     The $3.35 million loan to Milovan Vlaskovic illustrates the defects in Heritage's CRE Lending Program.  This 95% LTV ratio loan was approved to refinance a land acquisition loan and to fund conversion of an eighteen-unit building into condominiums in Chicago's Rogers Park neighborhood, which was already saturated with such projects at the time.  The appraisal concluded the project was "not financially feasible," and the project had no pre-sales; but in April 2007, the Loan Committee Defendants, and later the Director Defendants, approved it anyway.  To date, losses to the FDIC exceed $1.5 million.

42.     The $4.79 million loan for the 4518 N. Kedzie LLC project is also instructive. This 80% LTV ratio loan was approved to finance construction of a speculative development of eighteen residential units, three retail stores, and twenty parking spaces in Chicago's Albany Park neighborhood.  Despite mounting evidence that the Chicago condominium market was saturated and values were declining, the loan write-up sought approval based on "good market conditions in the subject area."  The write-up also touted six supposed pre-sales, but the Bank's regulatory examiners later found these sales were effectively invalid. Satisfied with the write-up, the Loan Committee, and later the Board, approved this loan on May 9, 2007.  To date, losses to the FDIC exceed $2.5 million.

**Continued Dividend and Incentive Payments**

43.     After December 1, 2006, Defendants made no attempt to bolster the Bank's ALLL reserves or increase Bank capital.  Faydash advised the Board – and the Board agreed – that the interest income on non-performing loans was not lost, but only "deferred," and would be realized by the Bank when the loans started to perform again.  The 2006 financial statements, prepared by Faydash and approved by the Board, kept the ALLL at just over 1%

of total loans, essentially the same level Heritage historically maintained. Faydash and the Board also failed to increase the Bank's capital to cushion against losses.

44.     Instead of protecting the Bank's assets, the Director Defendants continued to make dividend and incentive compensation payments. Faydash recommended, and the Board agreed, to boost the Bank's 2006 dividend payment to HCBI to more than $3 million, which was 25.14% of total Bank equity. This was more than four times greater than dividends paid by other banks in Heritage's peer group, which averaged only 5.73% of bank equity. Faydash also proposed, and the Board approved, dividends of $6.5 million over the course of 2007, and $700,000 in April 2008.

45.     The Director Defendants also caused and allowed Heritage to pay $825,000 in "incentive awards" related to CRE lending in 2007, with Defendants Saphir, Fanning, Faydash, and Jelinek receiving most of those awards. Another $205,000 in incentive compensation was awarded in 2008, but $155,000 of this was rescinded shortly before the Bank failed.

46.     In total, the Director Defendants and Faydash caused and allowed Heritage to pay $11.075 million in dividends and incentive compensation awards after December 1, 2006, when it was apparent that the CRE Lending Program was failing, the ALLL was insufficient, and the Bank's capital was inadequate to provide a cushion against losses in its CRE loan portfolio.

## CLAIMS FOR RELIEF

### CLAIMS AGAINST DIRECTOR DEFENDANTS
**(Saphir, Fanning, Nathan, Anthony, Brucer, Champion, and Mills)**

### COUNT I
**Gross Negligence – Violation of 12 U.S.C. § 1821(k)**

47.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-46 above as if fully set out in this Count.

48.     Defendants Saphir, Fanning, Nathan, Anthony, Brucer, Champion, and Mills (the "Director Defendants") were Directors of Heritage. Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds such directors of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law. Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton, and reckless conduct.

49.     The Director Defendants owed duties to the Bank to conduct its business consistent with safe and sound lending practices. These duties included, but were not limited to, the following:

      A.     Establishing and enforcing lending policies, including limits on CRE concentrations and limits on speculative and/or high-LTV CRE projects;

      B.     Establishing sufficient reserves for loan losses and maintaining adequate capital consistent with the risk inherent in the CRE Lending Program;

      C.     Ensuring that the Bank had sufficient, capable personnel to undertake and administer the CRE Lending Program;

D.      Complying with regulatory standards regarding its CRE Lending Program; and

E.      Correcting deficiencies identified in Reports of Examination performed by state and federal bank examiners.

50.      The Director Defendants breached their duties and were grossly negligent by, *inter alia*, failing to supervise management in the design, implementation, and operation of the CRE Lending Program to ensure that it met appropriate standards, including those identified in the preceding paragraph.

51.      In addition, the Director Defendants breached their duties and were grossly negligent by voting to approve one or more of the CRE loans identified in the chart in ¶ 40 above, because they knew:

A.      The Chicago-area CRE market was already saturated, and a real estate "bubble" had been inflated;

B.      Heritage was already over-exposed to CRE risk and had insufficient ALLL reserves to cushion against that risk; and

C.      Each such loan involved one or more of the following characteristics, which increased the risk of default:

(1)      An excessive LTV ratio, as measured by applicable regulatory standards and Heritage's own loan policy;

(2)      A deficient or incomplete appraisal, or an appraisal that deemed the project unfeasible, despite warnings from examiners that Heritage must comply with minimum appraisal standards in 12 C.F.R. § 323.4(c);

(3)      An inaccurate credit rating under Heritage's loan policy that failed to take into account the risk attendant to the project;

17

    (4)      A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

    (5)      Insufficient proof of pre-sales and/or necessary market demand; or

    (6)      Insufficient collateral.

52.    After December 1, 2006, the Director Defendants should have also increased loan loss reserves and Bank capital. Instead, the Director Defendants were grossly negligent by approving $11.075 million in dividends to HCBI and in incentive awards paid to senior management, both of which depleted the Bank's capital.

53.    As a direct and proximate result of the Director Defendants' gross negligence, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT II
### Negligence (Illinois law)

54.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-46 above as if fully set out in this Count.

55.    The Director Defendants owed duties to the Bank to conduct its business consistent with safe and sound lending practices. These duties included, but were not limited to, the following:

    A.      Establishing and enforcing lending policies, including limits on CRE concentrations and limits on speculative and/or high-LTV CRE projects;

    B.      Establishing sufficient reserves for loan losses and maintaining adequate capital consistent with the risk inherent in the CRE Lending program;

    C.      Ensuring that the Bank had sufficient, capable personnel to undertake and administer the CRE Lending Program;

       D.      Complying with regulatory standards regarding its CRE Lending Program; and

       E.      Correcting deficiencies identified in Reports of Examination performed by state and federal bank examiners.

56.    The Director Defendants breached their duties and were negligent by, *inter alia*, failing to supervise management in the design, implementation, and operation of the CRE Lending Program to ensure that it met appropriate standards, including those identified in the preceding paragraph.

57.    In addition, the Director Defendants breached their duties and were negligent by voting to approve one or more of the CRE loans identified in the chart in ¶ 40 above because they knew:

       A.      The Chicago-area CRE market was already saturated, and a real estate "bubble" had been inflated;

       B.      Heritage was already over-exposed to CRE risk and had insufficient ALLL reserves to cushion against that risk; and

       C.      Each such loan involved one or more of the following characteristics, which increased the risk of default:

          (1)    An excessive LTV ratio, as measured by applicable regulatory standards and Heritage's own loan policy;

          (2)    A deficient or incomplete appraisal, or an appraisal that deemed the project unfeasible, despite warnings from examiners that Heritage must comply with minimum appraisal standards in 12 C.F.R. § 323.4(c);

          (3)    An inaccurate credit rating under Heritage's loan policy that failed to take into account the risk attendant to the project;

(4)      A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

(5)      Insufficient proof of pre-sales and/or necessary market demand; or

(6)      Insufficient collateral.

58.     The Director Defendants were also negligent in voting to approve CRE loans before December 1, 2006, to the extent that they knew or should have known any of the foregoing conditions were present.

59.     After December 1, 2006, the Director Defendants should have increased loan loss reserves and Bank capital. Instead, the Director Defendants were negligent by approving $11.075 million in dividends to HCBI and in incentive awards paid to senior management, both of which depleted the Bank's capital.

60.     As a direct and proximate result of the Director Defendants' negligence, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT III
### Breach of Fiduciary Duty (Illinois law)

61.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-46 above as if fully set out in this Count.

62.     The Director Defendants owed Heritage a fiduciary duty to act with the utmost care and in the best interests of the Bank in supervising management in the design, implementation, and operation of the CRE Lending Program to protect the Bank against excessive risk. That, in turn, included but was not limited to a duty to ensure that management designed and implemented the CRE Lending Program to comply with safe and sound lending practices. These duties included, but were not limited to, the following:

A.      Establishing and enforcing lending policies, including limits on CRE concentrations and limits on speculative and/or high-LTV CRE projects;

B.      Establishing sufficient reserves for loan losses and maintaining adequate capital consistent with the risk inherent in the CRE Lending Program;

C.      Ensuring that the Bank had sufficient, capable personnel to undertake and administer the CRE Lending Program;

D.      Complying with regulatory standards regarding its CRE Lending Program; and

E.      Correcting deficiencies identified in Reports of Examination performed by state and federal bank examiners.

63.      The Director Defendants breached their fiduciary duties by, *inter alia*, failing to supervise management in the design, implementation, and operation of the CRE Lending Program to ensure that it met appropriate standards, including those identified in the preceding paragraph.

64.      In addition, the Director Defendants breached their fiduciary duties by voting to approve one or more of the CRE loans identified in the chart in ¶ 40 above, because they knew:

A.      The Chicago-area CRE market was already saturated, and a real estate "bubble" had been inflated;

B.      Heritage was already over-exposed to CRE risk and had insufficient ALLL reserves to cushion against that risk; and

C.      Each such loan involved one or more of the following characteristics, which increased the risk of default:

(1) An excessive LTV ratio, as measured by applicable regulatory standards and Heritage's own loan policy;

(2) A deficient or incomplete appraisal, or an appraisal that deemed the project unfeasible, despite warnings from examiners that Heritage must comply with minimum appraisal standards in 12 C.F.R. § 323.4(c);

(3) An inaccurate credit rating under Heritage's loan policy that failed to take into account the risk attendant to the project;

(4) A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

(5) Insufficient proof of pre-sales and/or necessary market demand; or

(6) Insufficient collateral.

65. The Director Defendants also breached their fiduciary duties by voting to approve CRE loans before December 1, 2006, to the extent that they knew or should have known any of the foregoing conditions were present.

66. After December 1, 2006, the Director Defendants should have increased loan loss reserves and Bank capital. Instead, the Director Defendants breached their fiduciary duties by approving $11.075 million in dividends to HCBI and in incentive awards paid to senior management, both of which depleted the Bank's capital.

67. As a direct and proximate result of the Director Defendants' breaches of fiduciary duties, Plaintiff suffered damages in an amount to be determined at trial.

## CLAIMS AGAINST LOAN COMMITTEE DEFENDANTS
### (Saphir, Fanning, Nathan, Hetler, Jelinek, and Moseley)

### COUNT IV
### Gross Negligence – Violation of 12 U.S.C. § 1821(k)

68.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-46 above as if fully set out in this Count.

69.     The Defendants who sat on the Heritage Loan Committee – Saphir, Fanning, Nathan, Hetler, Jelinek, and Moseley (the "Loan Committee Defendants") – were directors and/or officers of Heritage.

70.     Section 1821(k) of FIRREA holds such directors or officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.  Illinois law defines "gross negligence" as "very great negligence," but something less than willful, wanton, and reckless conduct.

71.     As directors and/or officers, the Loan Committee Defendants owed Heritage the duty to use reasonable care, skill, and diligence in the performance of their duties, including but not limited to the following:

      A.     To enforce prudent lending policies, including limits on Heritage's CRE Lending Program;

      B.     To make informed decisions about loans they approved, including the CRE loans identified above, consistent with sound underwriting standards; and

      C.     To ensure that loans approved by the Loan Committee were properly monitored, and that loans that were extended and renewed did not delay recognition of non-performing credits and credit losses.

72.     After December 1, 2006, the Loan Committee Defendants breached their duties and were grossly negligent by, *inter alia*: (a) continuing to operate the CRE Lending Program in an unsafe and unsound manner, despite evidence of its failure; and (b) continuing to approve loans with underwriting weaknesses and/or with insufficient financial information to assess borrower creditworthiness.

73.     In addition, the Loan Committee Defendants were grossly negligent by voting to approve one or more of the CRE-related loans identified in the chart in ¶ 40 above, among others, because they knew:

    A.     The Chicago-area CRE market was already saturated, and a real estate "bubble" had been inflated;

    B.     Heritage was already over-exposed to CRE risk and had insufficient ALLL reserves to cushion against that risk; and

    C.     Each such loan involved one or more of the following characteristics, which increased the risk of default:

        (1)     An excessive LTV ratio, as measured by applicable regulatory standards and Heritage's own loan policy;

        (2)     A deficient or incomplete appraisal, or an appraisal that deemed the project unfeasible, despite warnings from examiners that Heritage must comply with minimum appraisal standards in 12 C.F.R. § 323.4(c);

        (3)     An inaccurate credit rating under Heritage's loan policy that failed to take into account the risk attendant to the project;

        (4)     A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

        (5)     Insufficient proof of pre-sales and/or necessary market demand; or

(6)     Insufficient collateral.

74.     As a direct and proximate result of the Loan Committee Defendants' gross negligence, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT V
## Negligence (Illinois law)

75.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-46 above as if fully set out in this Count.

76.     As directors and/or officers, the Loan Committee Defendants owed Heritage the duty to use reasonable care, skill, and diligence in the performance of their duties, including but not limited to the following:

A.     To enforce prudent lending policies, including limits on Heritage's CRE Lending Program;

B.     To make informed decisions about loans it approved, including the CRE loans identified above, consistent with sound underwriting standards; and

C.     To ensure that loans approved by the Loan Committee were properly monitored, and that loans that were extended and renewed did not delay recognition of non-performing credits and credit losses.

77.     The Loan Committee Defendants breached their duties and were negligent by, *inter alia*:  (a) permitting the operation and continuation of the CRE Lending Program in an unsafe and unsound manner, despite evidence of its failure; and (b) approving loans with underwriting weaknesses and/or without sufficient financial information to assess borrower creditworthiness.

78.     In addition, the Loan Committee Defendants were negligent by voting to
approve one or more of the CRE loans identified in the chart in ¶ 40 above, because they
knew:

A.     The Chicago-area CRE market was already saturated, and a real estate
"bubble" had been inflated;

B.     Heritage was already over-exposed to CRE risk and had insufficient
ALLL reserves to cushion against that risk; and

C.     Each such loan involved one or more of the following characteristics,
which increased the risk of default:

(1)     An excessive LTV ratio, as measured by applicable regulatory
standards and Heritage's own loan policy;

(2)     A deficient or incomplete appraisal, or an appraisal that deemed
the project unfeasible, despite warnings from examiners that
Heritage must comply with minimum appraisal standards in
12 C.F.R. § 323.4(c);

(3)     An inaccurate credit rating under Heritage's loan policy that
failed to take into account the risk attendant to the project;

(4)     A borrower or guarantor (or both) with excessive liabilities, or
who otherwise lacked the financial wherewithal to service the
loan;

(5)     Insufficient proof of pre-sales and/or necessary market demand;
or

(6)     Insufficient collateral.

79.     The Loan Committee Defendants were also negligent by voting to approve
CRE loans before December 1, 2006, to the extent that they knew or should have known any
of the foregoing conditions were present.

80.     As a direct and proximate result of the Loan Committee Defendants'

negligence, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT VI
### Breach of Fiduciary Duty (Illinois law)

81.     Plaintiff re-alleges and incorporates by reference the allegations contained in

paragraphs 1-46 above as if fully set out in this Count.

82.     As officers and/or directors of Heritage, and as members of its Loan

Committee, the Loan Committee Defendants owed a Heritage fiduciary duty to act with the

utmost care and in the best interests of Heritage in deciding whether to approve CRE-related

loans, including but not limited to the following:

      A.     To enforce prudent lending policies, including limits on Heritage's

CRE Lending Program;

      B.     To make informed decisions about loans it approved, including the

CRE loans identified above, consistent with sound underwriting standards; and

      C.     To ensure that loans approved by the Loan Committee were properly

monitored, and that loans that were extended and renewed did not delay recognition of

non-performing credits and credit losses.

83.     The Loan Committee Defendants breached their fiduciary duties by, *inter alia*:

(a) permitting the operation and continuation of the CRE Lending Program in an unsafe and

unsound manner, despite evidence of its failure; and (b) continuing to approve loans with

underwriting weaknesses and/or without sufficient financial information to assess borrower

credit worthiness.

84.     In addition, the Loan Committee Defendants breached their fiduciary duties in voting to approve one or more of the CRE loans identified in the chart in ¶ 40 above because they knew:

A.     The Chicago-area CRE market was already saturated, and a real estate "bubble" had been inflated;

B.     Heritage was already over-exposed to CRE risk and had insufficient ALLL reserves to cushion against that risk; and

C.     Each such loan involved one or more of the following characteristics, which increased the risk of default:

(1)     An excessive LTV ratio, as measured by applicable regulatory standards and Heritage's own loan policy;

(2)     A deficient or incomplete appraisal, or an appraisal that deemed the project unfeasible, despite warnings from examiners that Heritage must comply with minimum appraisal standards in 12 C.F.R. § 323.4(c);

(3)     An inaccurate credit rating under Heritage's loan policy that failed to take into account the risk attendant to the project;

(4)     A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

(5)     Insufficient proof of pre-sales and/or necessary market demand; or

(6)     Insufficient collateral.

85.     The Loan Committee Defendants were also negligent by voting to approve CRE loans before December 1, 2006, to the extent they knew or should have known any of the foregoing conditions were present.

86.     As a direct and proximate result of the Loan Committee Defendants' breach of their fiduciary duties, Plaintiff suffered damages in an amount to be determined at trial.

## CLAIMS AGAINST FAYDASH

### COUNT VII
### Gross Negligence – Violation of 12 U.S.C. § 1821(k)

87.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-46 above as if fully set out in this Count.

88.     As the Bank's Chief Financial Officer, Faydash was an Officer of Heritage subject to § 1821(k) of FIRREA, which holds him personally liable for loss or damage to the institution caused by "gross negligence," as defined by applicable state law. Illinois law defines "gross negligence" as "very great negligence," but something less than willful, wanton, and reckless conduct.

89.     Faydash owed the Bank a duty to use reasonable care, skill, and diligence in the performance of his duties, including, among other duties, preparing the Bank's financial statements and tax returns; submitting the Bank's Quarterly Call Reports and complying with the Bank's other regulatory reporting requirements; analyzing data used to prepare the Bank's financial statements, tax returns, and other reports to ensure the integrity of that data; and accurately presenting the Bank's financial condition to the Board of Directors.

90.     After December 1, 2006, Faydash was grossly negligent by, *inter alia*:

A.      Failing to ensure that the Bank's ALLL reserves were sufficient when, among other indicators, an increasing number of distressed CRE credits, showed the CRE Lending Program was failing;

29

B.      Failing to ensure that the Bank maintained sufficient capital to cushion against high-risk CRE loan losses;

C.      Improperly advising the Board to approve dividends to HCBI and incentive compensation awards to senior management at a time when he should have recommended that the Board increase ALLL reserves and the Bank's capital; and

D.      Improperly advising the Board that interest income on non-accrual loans "has only been deferred."

91.     As a direct and proximate result of the Faydash's gross negligence, Plaintiff suffered damages, including at least the $11.075 million paid in dividends and incentive compensation awards after December 1, 2006, in an amount to be determined at trial.

## COUNT VIII
### Negligence (Illinois law)

92.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-46 above as if fully set out in this Count.

93.     Faydash owed the Bank a duty to use reasonable care, skill, and diligence in the performance of his duties, including, among other duties, preparing the Bank's financial statements and tax returns; submitting the Bank's Quarterly Call Reports and complying with the Bank's other regulatory reporting requirements; analyzing data used to prepare the Bank's financial statements, tax returns, and other reports to ensure the integrity of that data; and accurately presenting the Bank's financial condition to the Board of Directors.

94.     Faydash breached his duties and was negligent by, *inter alia*:

A.      Failing to ensure the sufficiency of ALLL reserves, as reflected in the Bank's financial statements;

B.      Failing to ensure that the Bank maintained a sufficient level of capital;

C.      Failing to accurately advise the Board of Directors about the financial condition of the Bank; and

D.      Recommending dividends and incentive compensation award payments that were unreasonable in light of the Bank's overall financial condition.

95.      As a direct and proximate result of Faydash's negligence, Plaintiff has suffered damages, including at least the $11.075 million paid in dividends and incentive compensation awards after December 1, 2006, in an amount to be determined at trial.

## COUNT IX
### Breach of Fiduciary Duty (Illinois law)

94.      Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-46 above as if fully set out in this Count.

95.      As the Bank's Chief Financial Officer, Faydash owed Heritage a fiduciary duty to act with the utmost care and in the best interests of Heritage in the performance of his duties, including, among other duties, preparing the Bank's financial statements and tax returns; submitting the Bank's Quarterly Call Reports and complying with the Bank's other regulatory reporting requirements; analyzing data used to prepare the Bank's financial statements, tax returns, and other reports to ensure the integrity of that data; and accurately presenting the Bank's financial condition to the Board of Directors.

96.      Faydash breached his duties and was negligent by, *inter alia*:

A.      Failing to ensure that the Bank maintained adequate ALLL reserves, as reflected in the Bank's financial statements;

B.      Failing to ensure that the Bank maintained sufficient capital;

C.      Failing to accurately advise the Board of Directors about the financial condition of the Bank; and

D.      Recommending dividends and incentive compensation award payments that were unreasonable in light of the Bank's overall financial condition.

97.     As a direct and proximate result of Faydash's breach of his fiduciary duties, Plaintiff has suffered damages, including at least the $11.075 million paid in dividends and incentive awards after December 1, 2006, in an amount to be determined at trial.

WHEREFORE, the Federal Deposit Insurance Corporation, as Receiver of Heritage Community Bank, demands a trial by jury and judgment in its favor and against the Defendants, as follows:

A.      Determining the amount of damages caused by Defendants;

B.      Determining the amount of accrued interest (including pre-judgment interest) on such damages;

C.      Awarding the FDIC the full amount thereof;

D.      Awarding the FDIC its costs and other expenses incurred by it in connection with this proceeding; and

E.      Granting the FDIC such other and further relief as this Court may deem just and proper under the circumstances.

Respectfully submitted,

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Heritage Community Bank**

Dated:  November 1, 2010.                   _/s/ Susan Valentine_____
                                            One of Its Attorneys

Susan Valentine (ARDC No. 6196269)
Robert S. Michaels (ARDC No. 6203462)
Megan O'Malley Chessare (ARDC No. 6293492)
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Facsimile
svalentine@robinsoncurley.com
rmichaels@robinsoncurley.com
mchessare@robinsoncurley.com

Leonard J. DePasquale
FEDERAL DEPOSIT INSURANCE CORPORATION
3501 North Fairfax Drive, VS-E-7016
Arlington, Virginia 22226
(703) 562-2063 – Telephone
ldepasquale@FDIC.gov