**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Heritage Community Bank, | ) ) ) ) |
| Plaintiff, | ) Case No. 10-cv-7009 ) |
| v. | ) JURY DEMANDED ) |
| JOHN M. SAPHIR; PATRICK G. FANNING; STEPHEN L. FAYDASH; WILLIAM E. HETLER; THOMAS JELINEK; LORI A. MOSELEY; STEPHEN ANTHONY; JERRY C. BRUCER; JAMES K. CHAMPION; ANDREW B. NATHAN; and MARY C. MILLS, | ) Judge Rebecca Pallmeyer ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANT JOHN M. SAPHIR'S MEMORANDUM
<u>IN SUPPORT OF MOTION TO DISMISS THE FDIC'S COMPLAINT</u>**

John M. George, Jr.
Nancy A. Temple
KATTEN & TEMPLE LLP
542 S. Dearborn St., Suite 1060
Chicago, Illinois 60605
312-663-0800
312-663-0900 (fax)

January 24, 2011                    Counsel for Defendant John M. Saphir

## TABLE OF CONTENTS

FACTUAL BACKGROUND............................................................................................2

ARGUMENT .................................................................................................................7

    I.    THE BREACH OF FIDUCIARY DUTY AND NEGLIGENCE CLAIMS AGAINST THE DIRECTOR DEFENDANTS ARE BARRED BY THE ILLINOIS BANKING ACT AND THE HERITAGE BY-LAWS. .....................8

    II.    THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED AS DUPLICATIVE...........................................................................................10

    III.    COUNTS I AND IV DO NOT SUPPORT A PLAUSIBLE INFERENCE THAT DEFENDANTS WERE GROSSLY NEGLIGENT. ..........................10

        A.    The FDIC'S Allegations are Refuted by its Own Evidence. ...........10

        B.    The FDIC's Vague Boilerplate Assertions do not Support any Inference of Gross Negligence. .....................................................12

        C.    The Director Defendants are Entitled to the Protections of the Illinois Banking Act and the Business Judgment Rule. ..................17

        D.    The Director Defendants Were Not Grossly Negligent in Not Increasing the ALLL by a Greater Amount.....................................17

    IV.    COUNTS V AND VI FAIL TO ALLEGE THAT THE LOAN COMMITTEE DEFENDANTS WERE NEGLIGENT OR BREACHED THEIR DUTIES ..20

CONCLUSION............................................................................................................20

i

## TABLE OF AUTHORITIES

<u>Cases</u>                                                              <u>Page</u>

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).................................................................7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)........................................ *passim*

*Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 2010 WL 3545389 (N.D. Ga.
    Sept. 10, 2010).................................................................................16

*Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009)................................................7

*Carlson v. Xerox Corp., 392 F. Supp. 2d. 267 (D. Cir. 2005)*.........................................19

*Cat Iron v. Bodine Environmental Services*, 2010 WL 37679862 (C.D. Ill.
    Sept. 29, 2010) .................................................................................9

*In re Countrywide Fin. Corp. Secs. Litig.* 588 F. Supp. 2d 1132, (C.D. Cal. 2008) .......19

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990).....................................15

*FDIC v. Atherton*, 519 U.S. 213 (1997).........................................................8

*FDIC v. Gravee*, 966 F. Supp. 622 (N.D. Ill. 1997) ........................................10

*FDIC v. Wise*, 758 F. Supp. 1414 (D. Colo. 1991) ........................................14

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ...................................3, 9

*Hoagland v. Sandberg, Phoenix & Von Gontard, P.C.*, 385 F.3d 737 (7th Cir. 2004).....10

*In re Text Messaging Antitrust Litig.*, 2010 WL 5367383 (7th Cir. Dec. 29, 2010) ...........7

*Mendelovitz v. Comdisco, Inc.*, 1993 WL 367091 (N.D. Ill. Sept. 16, 1993)..................18

*Metz v. Independent Trust Corp., 994 F. 2d 395* (7th Cir. 1993).....................................9

*Murphy v. Cando,* 1931 WL 3142 (Ill. App. Ct. 1931) ....................................9

*Neade v. Portes,* 739 N.E.2d 496 (Ill. 2009) ................................................10

*Neil v. Zell, 677 F. Supp. 2d 1010 (N.D. Ill. 2009)*.....................................5

*O'Melveny & Myers v. FDIC,* 512 U.S. 79 (1994) .........................................8

*Oakland County Employees' Retirement Sys. v. Massaro,* 2010 WL 3502772
    (N.D. Ill. Sept. 7, 2010).................................................................11, 19

*RTC v. Blasdell,* 154 F.R.D. 675 (D. Ariz. 1993) ............................................................ 13

*Service Auto Parts, Inc. v. Benjamin & Birkenstein, P.C.,* 2004 WL 2359233
  (N.D. Ill. Oct. 19, 2004) ................................................................................................ 10

*Shalala v. Guernsey Mem. Hosp.,* 514 U.S. 87 (1995) .................................................. 19

*Sherman v. Ryan, 911 N.E.2d 378 (Ill. App. Ct. 2009)* .................................................. 18

*Stamp v. Touche Ross & Co.,* 636 N.E.2d 616 (Ill. App. Ct. 1993) ................................ 18

*Talton v. Unisource Network Services, Inc.,* 2004 WL 2191605 (N.D. Ill.
  Sept. 27, 2004) ............................................................................................................ 17

*Thor Power Tool Co. v. Comm'r of Internal Revenue,* 439 U.S. 522 (1979) ................. 19

*U.S. v. Skilling, 2006 WL 1155566* (S.D. Tex. Apr. 27, 2006) ........................................ 19

*Wojtas v. Capital Guardian Trust Co.,* 477 F.3d 924 (7th Cir. 2006) ............................. 10

## Statutes, Rules and Regulations

Fed. R. Civ. P. 8  .......................................................................................................... 2, 13

Fed. R. Civ. P. 12(b)(6)  .................................................................................................... 1

12 U.S.C. § 1820(d) .......................................................................................................... 3

12 U.S.C. § 1821(k) .................................................................................................. 6, 7, 9

12 C.F.R. 363.2 ............................................................................................................... 18

12 C.F.R. Part 365, Appendix A ........................................................................................ 5

Illinois Banking Act, 205 ILCS 5/14 ................................................................................ 19

Illinois Banking Act, 205 ILCS 5/16 ........................................................................... 17, 18

Illinois Banking Act, 205 ILCS 5/39 .............................................................................. 8, 9

The Complaint fails to state a claim upon which relief can be granted and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants are former officers and directors of Heritage Community Bank ("Heritage" or "the Bank"), which was closed by the Illinois Department of Financial and Professional Regulation ("IDFPR") on February 27, 2009. The FDIC sues as Receiver, alleging that by December 1, 2006, Defendants should have known that the Bank's commercial real estate ("CRE") loan program was in trouble, should have ceased all CRE lending, and should have increased the Bank's capital and allowance for loan and lease losses ("ALLL"). The FDIC seeks to hold Defendants liable for dividends paid to the Bank's parent holding company, Heritage Community Bancorporation, Inc. ("HCBI") and unspecified losses on all CRE loans made after December 1, 2006 without alleging how particular Defendants caused such alleged losses. The FDIC identifies only ten allegedly deficient CRE loans made in 2007, but again fails to specify why those loans were deficient when made or any individual's alleged involvement with any of them.

Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the FDIC's vague allegations fail to support a plausible inference that there were alleged problems in the CRE portfolio as of December 1, 2006 and that Defendants should have known about them. To the contrary, the documents the FDIC cites flatly refute such an inference. The FDIC fails to identify a single loan on the books at year-end 2006 that required an increase to the ALLL. There is no plausible basis for concluding that the Defendants should have suspended CRE lending, increased its loan loss reserve, or suspended its dividend program. Although the FDIC generally criticizes the Bank's underwriting of ten 2007 CRE loans that allegedly resulted in total losses of $8.5 million, it makes no factual

1

allegations as to eight of those loans, which total $4.3 million in alleged losses. The FDIC's cursory assertion of boilerplate claims of alleged deficiencies in the 2007 loans fails to lead to a plausible inference of fault, as required by *Twombly* and Rule 8.

The FDIC's inadequate allegations are the best it could do after assuming control of the Bank's records 20 months ago and conducting an 18-month-long regulatory investigation complete with administrative subpoenas for records and depositions. The Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

Heritage was a state-chartered, FDIC-insured community bank serving largely the south suburban and northwest Indiana portion of the Chicago metropolitan area. Defendant John Saphir, the Bank's former CEO, had been with Heritage or its predecessor for over 40 years. Complaint ¶ 7. Heritage began making CRE loans in the early 2000's. Complaint ¶ 2. The FDIC does not claim that the program was not initially successful, nor does the Complaint identify any losses on loans made prior to 2007, when an unprecedented collapse in U.S. real estate values and the worst international recession since the Great Depression caused wide-spread losses in loan portfolios throughout the country and the closure of over 300 FDIC-insured banks, including Heritage. The FDIC identifies losses on only ten loans made in 2007.

Before it was closed, Heritage was subject to regular supervisory examinations by both the IDFPR and the FDIC. The Federal Deposit Insurance Act, which requires annual examinations of FDIC-insured banks, allows for an interval between examinations of up to 18 months for banks that, like Heritage, have less than $500,000,000 in assets and that were found to be well capitalized and well managed at

their last examination. 12 U.S.C. §1820(d). Although the FDIC alleges that deficiencies in the Bank's CRE program were apparent from the program's inception, nearly nine years before the Bank failed, the Complaint contains no allegations that the Bank concealed any aspect of its program from state or federal examiners, or refused to act on any regulatory recommendation relating to the CRE program or any other part of the Bank's operations. With the benefit of hindsight, the FDIC complains that Bank personnel were inexperienced in CRE lending, but it points to no contemporary regulatory criticism of the experience level of the Bank's lenders, which increased over the years. Overall, the Complaint is tellingly silent regarding the years of examinations that occurred prior to the worldwide economic collapse.

The FDIC alleges that "[i]n each of the first three quarters of 2006, Heritage's Uniform Bank Performance Reports ("UBPR") showed the Bank in the bottom 3% to 4% of its peer group with respect to net losses for construction and land development loans," and that Defendants therefore should have known by December 1, 2006 that "Heritage's CRE Lending Program was failing." Complaint ¶39.[1] In fact, the UBPRs show that in the first three quarters of 2006, Heritage experienced very small net losses on its CRE loans. Because the FDIC cites the public UBPRs, the Court may consider them. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009). The 2006 UBPRs for March 31, June 30, and September 30 are Exhibits A through C hereto respectively.

The data in the UBPRs is compiled by the FDIC from information provided by reporting banks. "Net losses" on various categories of loans are calculated as gross losses on those loans, less recoveries. *A User's Guide for the Uniform Bank*

---

[1] Each UBPR "cover[ed] the operations of a bank and that of a comparable group of peer banks" and is "for the use of the federal regulators of financial institutions in carrying out their supervisory responsibilities." Ex. A, p.1.

*Performance Report* at III-33.[2]  Contrary to the FDIC's allegations, Heritage had *no* net losses on its construction and land development loans during the first quarter of 2006, which was *less* than the experience of its Peer Group. Ex. A, at 13 of 34. The Bank's recoveries on all other loans exceeded its gross losses by $1,000 and yet management conservatively increased Heritage's ALLL by $250,000. *Id.* At that time, the Bank's net assets were in the range of $300 million. By June 30, the Bank had net year-to-date losses of $198,000 on its entire loan portfolio, with net losses in its land and construction portfolio of just 0.34%. *See* Ex. B at 13 of 32. Also by June 30, 2006, Heritage's total assets exceeded $300 million and the FDIC therefore assigned it to a new UBPR peer group of banks with assets of between $300 million and $1 billion. These much larger banks on average reported no net losses on their construction and land development loans as of the end of the second quarter of 2006. *Id.* By September 30, 2006, Heritage's net year-to-date losses on all loans were a mere $279,000 (after accounting for a $55,000 recovery), and the net losses on the land construction portfolio *improved* to 0.30%. *See* Ex. C at 13 of 34. Heritage management prudently increased the ALLL for the same period by $450,000, an amount over one-and-a-half times its net losses on all loans. *Id.*

The Complaint alleges that after December 1, 2006, the Bank made approximately $10.2 million in dividend payments to HCBI. *Id.* ¶44. The Complaint alleges that the Bank's CFO "and the Board agreed to boost the Banks' 2006 dividend payment to HCBI to more than $3 million, which was 25.14% of total Bank equity" and four times the dividends of the banks in Heritage's peer group. *Id.* The December 31, 2006 UBPR (Ex. D) shows that the 4 to 1 ratio was in line with the historical dividends of

[2] The cited page is in Exhibit E. The Guide is available at www.ffiec.gov/ubprguide.htm.

Heritage, the sole subsidiary of a Subchapter S corporation. Ex. D at 21 of 32.[3] The

FDIC also alleges that the Director Defendants allowed Heritage to make $875,000 in

incentive awards in 2007 and 2008, but it does not specify the amounts received by any

Defendant or allege why any awards were improper as to any Defendant. Id. at 45.

On January 4, 2007, Saphir wrote to the IDFPR regarding the loan to value

("LTV") ratio for certain loans on Heritage's books. The Complaint alleges that

regulators believed that these ratios exceeded the supervisory limits set forth in 12

C.F.R. Appendix A to Part 365 (Complaint ¶30), which is entitled "Interagency

Guidelines for Real Estate Lending" ("Interagency Guidelines") (emphasis added). The

Complaint alleges that Saphir "suggested" that the LTV limitations contained in the

Interagency Guidelines "was merely 'guidance,' not a binding limit, and that Heritage

had sufficient controls in its underwriting and loan monitoring functions to properly

manage risk in its loan portfolio." Complaint ¶30.

The Interagency Guidelines were issued by the Office of the Comptroller of the

Currency, the Board of Governors of the Federal Reserve System, the FDIC, and the

Office of Thrift Supervision and provides for "increased supervisory scrutiny" under

certain circumstances.[4] The FDIC does not (and cannot) allege that the regulators took

any action regarding any LTV issue or that they were misled by the letter.

---

[3] Neil v. Zell, 677 F. Supp. 2d 1010, 1017 n.2 (N.D. Ill. 2009) (subchapter S corporation profits are taxable income to its shareholders).

[4] "An institution will come under increased supervisory scrutiny as the total of all loans in excess of the supervisory LTV limits, including high LTV residential real estate loan exceptions, approaches 100 percent of total capital. If an institution exceeds the 100 percent of capital limit, its regulatory agency will determine if it has a supervisory concern and take action accordingly. Such action may include directing the institution to reduce its loans in excess of the supervisory LTV limits to an appropriate level, raise additional capital, or submit a plan to achieve compliance. The agencies will consider, among other things, the institution's capital level and overall risk profile, as well as the adequacy of its controls and operations, when determining

Heritage was one of 329 banks that have failed since 2008. This total includes community banks, like Heritage, and large financial institutions. An additional 860 banks are on the FDIC's so-called "troubled bank" list. The failed banks list does not include numerous overseas banks and non-bank financial institutions that were also casualties of the international economic calamity, nor does it include those "too-big-to-fail" banks. Because the ruination of Heritage would not wreak the economic havoc of a failure of an institution as large as Citibank, Heritage was not bailed out by anybody.[5]

The Complaint contains nine Counts directed against eleven former officers and directors: gross negligence under 12 U.S.C. § 1821(k) (Count I) and negligence (Count II) and breach of fiduciary duty (Count III) under Illinois law against the Director Defendants. Counts IV-VI raise the same claims against the Loan Committee Defendants and Counts VII-IX make the same claims against the CFO. The FDIC contends that Defendants knew or should have known by December 1, 2006 that the Banks's CRE program was a failure because of its net loan losses in the UBPRs, and that they were grossly negligent, negligent and breached their fiduciay duties by not using the dividends to increase the Bank's ALLL and capital by unspecified amounts and by not suspending the Bank's CRE program. The Complaint also alleges that the three groups of Defendants were grossly negligent, negligent and breached their fiduciary duties in approving ten allegedly deficient loans made in the first half of 2007.

---

whether these or other actions are necessary." Interagency Guidelines, p. 5, at www.fdic.govs/news/news/financial/1999/FIL9994.pdf.

[5] The FDIC permitted a *60 Minutes* camera crew to film the raid closing Heritage and to interview FDIC head Sheila Bair. A few months later, Bair was asked whether she ever thought that the economy would get as bad as it had and she responded "No. *Even I* didn't think things would ever be this bad." BankLawyer's Blog (May 25, 2009), available at www.banklawyersblog.com/3_bank_lawyers/2009/05/so-you-thought-being-a-bank-director-was-an-honor.html. The FDIC now seeks to hold Defendants to a far higher standard of economic forecasting.

All of the Counts fail to state a claim as matter of law. The FDIC's claims against the Director Defendants for negligence and breach of fiduciary duty are barred by the Heritage By-Laws and Illinois Banking Act. The FDIC's conclusory assertion of alleged CRE problems in December 2006 and alleged problems with the ten 2007 loans do not support a plausible inference of negligence, let alone gross negligence, and do not overcome the business judgment rule. Nothing in the Complaint supports a plausible inference that Saphir and other Defendants breached their fiduciary duty to the Bank.

## ARGUMENT

The facts must be pled sufficiently to state a plausible claim for relief as required by *Twombly*, 550 U.S. at 555-56, and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). A complaint must state a claim for relief that rises above the "speculative level," and must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 556. "[S]ome factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. . . . [I]n considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). The Complaint fails to meet the standards set by *Twombly*. *See In re Text Messaging Antitrust Litig.,* 2010 WL 5367383, at *6 (7th Cir. Dec. 29, 2010) ("what is plausible has a moderately higher likelihood of occurring" and "that the allegations undergirding a claim could be true is no longer enough to save a complaint from being dismissed").

Pursuant to 12 U.S.C. §1821(k) and *FDIC v. Atherton*, 519 U.S. 213 (1997), Illinois substantive law governs the FDIC's claims for gross negligence, negligence and

breach of fiduciary duty. The FDIC stands in the shoes of Heritage and has no greater rights than Heritage could have had and can assert no claims that Heritage could not have asserted. *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 86 (1994). The FDIC's fiduciary duty and negligence claims against the Director Defendants are barred by §39 of the Illinois Banking Act and Article X of the Heritage By-Laws and should be dismissed. The Complaint's gross negligence claims should be dismissed because they fail to support a plausible inference that Defendants' conduct was an extreme departure from due care. Nor do the duplicative common law negligence and breach of fiduciary duty claims support a plausible inference of actionable conduct. Finally, none of the FDIC's claims are pled sufficiently to overcome the business judgment rule.

## I. THE BREACH OF FIDUCIARY DUTY AND NEGLIGENCE CLAIMS AGAINST THE DIRECTOR DEFENDANTS ARE BARRED BY THE ILLINOIS BANKING ACT AND THE HERITAGE BY-LAWS.

The Illinois Banking Act expressly permits State-chartered banks, like Heritage, to limit the liability of directors to derivative and shareholder claims: "a State bank may establish that a director is not personally liable to the bank or the shareholders for monetary damages for a breach of the director's fiduciary duty," so long as the bank does not eliminate or limit the liability of a director for gross negligence, a breach of the duty of loyalty, bad faith, a transaction from which the director derived an improper personal benefit. 205 ILCS 5/39(b).

Article X of Heritage's By-Laws, "Personal Liability for Good Faith Actions," provided that

> To the fullest extent permitted by the Illinois Banking Act, as the same exists or may be hereafter amended, a director of this Bank shall not be

8

liable to the Bank or its stockholders for monetary damages for breach of fiduciary duty as a director.[6]

Exculpatory clauses such as Article X of the Heritage By-Laws are contractual in nature are routinely enforced in Illinois. *See Cat Iron v. Bodine Environmental Services*, 2010 WL 37679862 (C.D. Ill. Sept. 29, 2010) (collecting Illinois cases); *Metz v. Independent Trust Corp.*, 994 F.2d 395, 399-400 (7th Cir. 1993) (enforcing exculpatory clause in trust agreement). The FDIC is bound by the Heritage By-Laws and is barred from bringing breach of fiduciary duty claims against the Director Defendants.

Illinois has long held that bank "directors are not liable for slight negligence, nor for errors of judgment while acting in good faith; some consideration must be given to the view that directors of banks must not be held to a too high degree of care; otherwise responsible persons will not assume that position." *Murphy v. Cando,* 1931 WL 3142 (Ill. App. Ct. 1931). This high standard of liability is consistent with the Illinois Banking Act and Heritage's By-Laws. The entire purpose of §39 would be moot if the FDIC were permitted to evade its limitations simply by pleading negligence rather than breach of fiduciary duty. As §39 makes clear, Bank Directors can be held liable only for gross negligence or breach of the duties of loyalty and good faith, or for self-dealing. Because the FDIC does not allege that the Director Defendants breached their duty of loyalty, acted in bad faith, or engaged in self-dealing, the only claim that can be brought against them is one for gross negligence.

---

[6] Ex. F hereto. The By-Laws are integral to the FDIC's claims against the directors because they establish the standard of care under Illinois law, which is central to the FDIC's claim under 12 U.S.C. §1821(k). Thus, the By-Laws are appropriate to consider on a motion to dismiss. *Hecker,* 556 F.3d at 579 (fiduciary standard under ERISA statute was "central" to case, so summary plan description limiting scope of duty was properly considered on motion to dismiss).

II.     **THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED AS DUPLICATIVE.**

The FDIC's "negligence claim [is] nothing more than a reiteration of the fiduciary duty claim with a negligence label attached to it." *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2006). The Director Defendants are alleged to have breached their duty of care (*i.e.* to have acted negligently) and the conduct at issue is the same in both counts, and are thus duplicative. *See Neade v. Portes*, 739 N.E.2d 496, 500-02 (Ill. 2000); *Hoagland v. Sandberg, Phoenix & Von Gontard, P.C.*, 385 F.3d 737, 744 (7th Cir. 2004); *Service Auto Parts, Inc. v. Benjamin & Birkenstein, P.C.*, 2004 WL 2359233, at *1 (N.D. Ill. Oct. 19, 2004).

III.    **COUNTS I AND IV DO NOT SUPPORT A PLAUSIBLE INFERENCE THAT DEFENDANTS WERE GROSSLY NEGLIGENT.**

A.      **The FDIC'S Allegations are Refuted by its Own Evidence.**

The FDIC claims that Defendants should have known by December 1, 2006 that the Bank's CRE program was in trouble and should be suspended, yet it fails to allege facts to lead to a plausible inference that the program was in trouble or that Saphir and the other Director and Loan Committee Defendants were grossly negligent in failing to close it down. Under Illinois law, gross negligence is "'very great negligence . . . [b]ut it is something less than . . . . willful, wanton and reckless conduct.'" *FDIC v. Gravee*, 966 F. Supp. 622, 636 (N.D. Ill. 1997) (citation omitted). The FDIC's sketchy and abstract allegations fail to support a plausible inference that Defendants' conduct amounted to "very great negligence," and thus fail to pass muster under *Twombly*.

The FDIC's allegations are refuted by the evidence it cites. The FDIC's allegations regarding alleged problems with the Bank's CRE portfolio (and Defendants' supposed knowledge of those alleged problems) depend entirely upon the UBPR net

loan loss data. The UBPRs' net loan loss data are the only specific evidence the FDIC

cites to support its crucial theory that the CRE program was in trouble as of December

1, 2006, and that Defendants should have recognized the situation and taken action to

stop all CRE lending, shore up the Bank's capital, increase the ALLL, and suspend

dividends to the holding company.

The UBPRs' net loan loss figures refute the FDIC's allegations and the

inferences it asks the Court to draw. The first quarter 2006 UBPR is directly contrary to

the FDIC allegation that in the first quarter of 2006 Heritage's net losses on CRE loans

put it in the bottom 3% of its peer group because it in fact shows that *Heritage had no

losses on CRE loans in the first quarter of 2006.* See Ex. A at 13 0f 34. The UBPR

shows that by the third quarter of 2006, Heritage had $279,000 in *total* net loan losses

for the year to date, with the CRE portion of that amounting to just 0.30% of the CRE

portfolio. The FDIC offers no plausible basis to conclude that such a small net loss –

which objectively is miniscule both as a percentage of the total CRE portfolio and as an

absolute amount – is evidence of *any* problems with the Bank's CRE portfolio. More

implausible yet is the conclusion that such a tiny loss was so alarming that Defendants

were grossly negligent in not bringing the CRE program to a screeching halt. The FDIC

points to not one loan that was on the books as of December 1, 2006 and was in such

poor condition as to call in question Heritage's entire CRE loan program. *See Oakland

County Employees' Retirement Sys. v. Massaro,* 2010 WL 3502772, at *4 (N.D. Ill.

Sept. 7, 2010) (allegations of breach of fiduciary duty did not comply with Rule 8

because no facts indicated officers knew that accounting was improper).

**B.      The FDIC's Vague Boilerplate Assertions do not Support any Inference of Gross Negligence.**

The FDIC's failure to identify any problem CRE loans as of December 1, 2006

flies in the face of the Complaint's contention that the Defendants should have known

that the CRE program was doomed by that point.  Although the Complaint is replete

with boilerplate assertions regarding alleged problems with the Bank's underwriting (*id.*

¶¶24-32), loan monitoring (*id.* ¶¶33-35), and other practices (*id.* ¶¶ 36-38), none of

these are tied to losses on particular loans.  The allegations are uniformly expressed in

vague generalities (*e.g.,* "loan write-ups lacked a global analysis of the creditworthiness

of prospective borrowers and/or guarantors and, *in some instances*, relied on unverified

information" (*id.* ¶25); "loan grades . . . *were often* inflated" (*id.*); "*Frequently*, [Heritage

President's] unsupported belief in the borrower's ability to complete the project carried

more weight than the little credit analysis that was actually performed.")  *Id.* ¶27

(emphasis supplied).  The FDIC never specifies the loans that were made (or the losses

that supposedly resulted) from these generically described problems that allegedly

occurred "frequently," "often," or "in some instances."   Such allegations are nothing

more that the sort of "labels and conclusions and a formulaic recitation of the elements

of a cause of action" that fail under *Twombly*.  550 U.S. at 556.

The Complaint also alleges that Defendants owed a duty to correct "deficiencies

identified in Reports of Examination performed by state and federal bank examiners"

(Complaint ¶49(E)) and were grossly negligent in failing to address these unspecified

deficiencies.  *Id.* ¶50; *see also id.* ¶¶55, 56, 62, 63.  Although the Complaint contains a

vague allegation regarding "warnings from examiners that Heritage must comply with

minimum appraisal standards in 12 C.F.R. § 323.4" (*id.* ¶¶51, 57, 64), the Complaint

does not state when this "warning" allegedly was made, nor does it identify a single loan for which a loan was made with an appraisal that did not meet those standards.

The FDIC's conclusory allegations as to potential alleged deficiencies in some of the ten 2007 loans are as deficient as their allegations regarding the CRE program as a whole. The FDIC alleges that the Director and Loan Committee Defendants approved "one or more" of the 2007 loans, despite the fact that allegedly Heritage's ALLL was insufficient by an unidentified amount, and that the loans allegedly "involved one or more of the following characteristics, which increased the risk of default," then lists a litany of general characteristics, such as "inadequate collateral," without any specific facts. Complaint ¶¶ 51, 57, 64, 73, 78, 84. Notably, the FDIC fails to identify which issues allegedly existed for any specific loan at the time of origination. The FDIC also describes the 2007 loans as new loans or renewals, but does not bother to say which were which. The result is a Complaint replete with meaningless boilerplate that neither gives Defendants fair notice of the claims against them nor supports a plausible inference that they were grossly negligent in approving these loans (if in fact they even did.) An allegation, for example, that some loan guarantors may have been overextended is meaningless if no guarantor even existed as to a particular loan.

Courts have held that the FDIC, and its predecessor affiliate the RTC, do not satisfy Rule 8 notice standards by alleging generally that named loans were "unsafe and unsound" transactions. In *RTC v. Blasdell,* 154 F.R.D. 675, 690 (D. Ariz. 1993), the name of the transaction and the alleged loss amount failed to provide fair notice. In *Blasdell,* the court ordered the RTC to identify (1) the date or dates of each transaction, (2) the identity of the person or entities involved in each transaction, (3) a brief

13

statement regarding the unsafe or unsound nature of the transaction, and (4) the identity of the defendant alleged to be involved in each transaction. *Id.*; *FDIC v. Wise,* 758 F. Supp. 1414, 1420-21 (D. Colo. 1991) (striking allegations purporting to reserve right to prove additional unsound practices not in the complaint and allegations that identified transactions were only examples of other unsound practices). The Complaint fails to allege facts required for fair notice of the alleged deficiencies in the ten named CRE loans that allegedly total $8.5 million in losses, and also fails to allege any claim based on other unspecified CRE loans or other transactions that might make up the alleged $20 million in losses. Complaint ¶¶ 5, 40.

The FDIC goes beyond mere rote recitation of boiler plate with regard to just two of the 2007 loans, and even then its allegations are conclusory, counter-intuitive, and demonstrate 20-20 hindsight. As to the 4518 N. Kedzie LLC mixed-use project in Albany Park, the FDIC alleges that the loan had an 80% LTV ratio loan, but does not allege that this was improper or violated any standard of care or regulation. Complaint ¶42. The FDIC claims that there was "mounting evidence that the Chicago condominium market was saturated and values were declining," but that the loan write-up sought approval based on "'good market conditions in the subject area.'" *Id.* The FDIC further asserts that "The write-up also touted six supposed pre-sales, but the Bank's regulatory examiners *later* found these sales were effectively invalid. Satisfied with the write-up, the Loan Committee, and later the Board, approved this loan on May 9, 2007." *Id.* (emphasis supplied). The FDIC never alleges that Defendants were aware that the entire market was "saturated" or had reason to doubt the statement that market conditions were good in Albany Park. Nor does the FDIC explain how

14

Defendants could have known at the time that the pre-sales would later not pan out when the real estate market ultimately collapsed.

As to the Vlasokovic loan to refinance a Rogers Park condominium project, the Complaint alleges that Rogers Park "was already saturated with such projects at the time." The FDIC claims that the "appraisal concluded the project was 'not financially feasible,' and the project had no pre-sales," but the loan was nonetheless approved. *Id.* ¶41. The allegations make no sense. As the Complaint correctly points out, Saphir was the Bank's largest single shareholder, with an interest worth over $8,000,000, all of which was lost when the Bank was closed. It strains credulity to believe that he and other stockholding Defendants would risk everything to earn a modest return on loans that they knew were not "financially feasible." A single phrase that is taken out of context from an appraisal report and asks the reader of the Complaint to assume that the Defendants acted wholly irrationally cannot support a plausible inference that the Director and Loan Committee Defendants were grossly negligent.[7] *See DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir. 1990).

Finally, although the Complaint (¶30) fulminates about Saphir's letter to the regulators regarding alleged high LTV loans identified during an examination and his characterization of the "Guidelines" as "guidance," the FDIC does not allege that his letter was in fact improper. The FDIC concedes that the regulators were aware in 2006 that Heritage's high LTV loans had allegedly exceeded 100% of capital, but does not allege that the regulators took any of the supervisory actions suggested by the

---

[7] In the investigation, the FDIC, as a matter of policy, refused to provide Defendants access to the business records documenting the bases for Defendants' lending decisions. Thus, although the Complaint incorporates the Vlasokovic loan write-up by quoting a few words, because it is not attached to the Complaint, Defendants are unable to demonstrate on this motion to dismiss specifically how the FDIC has misstated the facts considered by Defendants regarding this loan.

Guidelines. The Complaint contains no allegations suggesting why Saphir was incorrect in "suggesting" that the "Guidelines" were "guidance," or why his letter to regulators regarding a situation they had identified (and concluded did not require supervisory action) constituted any sort of actionable conduct. Finally, the Complaint contains no allegations leading to a reasonable inference that Saphir did not believe (or was grossly negligent in believing) that the Bank had "sufficient controls in its underwriting and loan monitoring function to properly manage risk in its loan portfolio." *Id.* ¶30. Indeed, if such a statement were not true, no one would know better than the regulators who had just finished their examination of the Bank and apparently concluded that the Bank was sufficiently well managed to require no further action.[8]

Similar complaints founded upon negligence standards have been held deficient under *Twombly*. In *Belmont Holdings Corp. v. SunTrust Banks, Inc.,* 2010 WL 3545389 at *6 (N.D. Ga. Sept. 10, 2010), the court dismissed a complaint that alleged officers and directors failed to provide for adequate loan loss reserves where the reserves were significantly increased after the housing market collapsed. The court rejected such hindsight pleading: "[o]rdinarily, however, 'corporate officials need not be clairvoyant . . . .'" and "[i]n the case of loan losses, '[t]hat defendants later decided to revise the amount of loan loss reserves that [they] deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time . . . .'"; *id.* at *7 ("Plaintiff offers, at most, conclusory assertions, including that SunTrust's ALLL and loan loss provision were understated, as evidenced by the fact that SunTrust subsequently raised these figures after the economic downturn. . . . The Court concludes that Plaintiff's Complaint fails to provide minimal factual content,

---

[8] *See* Ex. A to Saphir's Mot. for Leave to File Document Under Seal (filed Jan. 24, 2011).

required by *Twombly,* to permit the court to draw a reasonable inference" that

defendants are liable).

The Complaint here improperly relies upon hindsight and the subsequent

economic collapse and contains no facts indicating any Defendant knew at the time

decisions were made that the loan loss reserves were materially understated or that any

specific loan was unsafe or unsound. Counts I and IV should therefore be dismissed.

**C.    The Director Defendants are Entitled to the Protections of the Illinois Banking Act and the Business Judgment Rule.**

Under the Illinois Banking Act, the Director Defendants were entitled to rely upon

"advice, information, opinions, reports or statements, including financial statements and

financial data, prepared or presented by (1) one or more officers or employees of the

bank whom the directors believes to be reliable and competent in the matter presented."

205 ILCS § 5/16. None of the FDIC's allegations provides any basis for concluding that

the Director Defendants were wrong to rely upon the loan write-ups recommending the

2007 loans, or that they were grossly negligent in doing so. There are no allegations

that the Director Defendants knew or were very greatly negligent in not knowing that the

information in the loan-write up was incorrect. To the contrary, the FDIC's allegations

make clear that their criticisms are based upon facts not discovered until after the loan

was made, when market conditions had greatly changed. (Similarly, there are no

allegations that the Loan Committee Defendants knew that any loan was unsound in

any way at the time it was made or were grossly negligent in approving it.)

Defendants are entitled to the protections of the business judgment rule, which

presumes "'that directors of a corporation make business decisions on an informed

basis, in good faith, and with the honest belief that the course taken was in the best

interests of the corporation.'" *Talton v. Unisource Network Services, Inc.*, 2004 WL

2191605 (N.D. Ill. Sept. 27, 2004) at *14 (citation omitted). With the benefit of hindsight,

the FDIC now questions the Bank's lending practices, but it never alleges that any

particular loan transaction was not made in good faith. The FDIC alleges no

management self-dealing, corporate skullduggery or bad faith and fails to the business

judgment rule. *See Stamp v. Touche Ross & Co.,* 636 N.E.2d 616, 621-22 (Ill. App. Ct.

1993) (allegations that underwriting procedures, controls and director oversight were

inadequate did not overcome business judgment rule); *Sherman v. Ryan,* 911 N.E.2d

378, 395-97 (Ill. App. Ct. 2009) (allegations did not overcome business judgment rule);

*Mendelovitz v. Comdisco, Inc.,* 1993 WL 367091 at *2 (N.D. Ill. Sept. 16, 1993)

(dismissing complaint).

### D. The Director Defendants Were Not Grossly Negligent in Not Increasing the ALLL by a Greater Amount.

Prior to December 1, 2006, the Director Defendants and Defendant Faydash

increased the Bank's allowance for loan and lease losses by $450,000. Exhibit C at 13

of 34. The FDIC claims that the Defendants were grossly negligent by not increasing it

by an additional, unspecified amount. By not identifying any loan that allegedly needed

greater reserves, the FDIC's claim that Defendants were grossly negligent in failing to

increase the Bank's ALLL fails.

Heritage was required to prepare its financial statements in accordance with

Generally Accepted Accounting Principles ("GAAP"), and to have them audited by an

independent auditor. 12 C.F.R. § 363.2. Notably, the FDIC does not allege that any of

Heritage's financial statements were materially misstated or violated GAAP. Nor does

the FDIC allege that any of the audits were negligent or that any audit reports were

misstated. The key GAAP provisions relating to loan loss reserves for FDIC regulated banks are Financial Accounting Standard ("FAS") 5, the standard for determining when to establish a reserve, and FAS 114, the standard for determining when a loan is impaired.[9] Together FAS 5 and FAS 114 require companies to establish reserves using a loss contingency and/or impairment analysis and prohibit them from booking general or so-called "cookie jar" reserves that do not reflect actual or foreseeable losses based on specific loans and facts. *See id; In re Countrywide Fin. Corp. Secs. Litig.,* 588 F. Supp. 2d 1132, 1179 (C.D. Cal. 2008) (to book loss reserve, FAS 5 requires "a great deal of information about an impairment," including "it *must be probable that one or more future events will occur* confirming the *fact of the loss"* and loss amount is reasonably estimable) (original emphasis).[10] GAAP is not science, and "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r of Internal Revenue,* 439 U.S. 522, 544 (1979); *Shalala v. Guernsey Mem. Hosp.,* 514 U.S. 87, 100-01 (1995). The FDIC does not allege any facts indicating that management's estimates violated GAAP.

As for the dividends, the FDIC does not allege any facts indicating that they were improper at the time they were made. There are no allegations that dividend decisions violated the Illinois Banking Act (205 ILCS 5/14), were corporate waste, or that any

---

[9] *See FDIC Policy Statement on Allowance for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions* (July 2, 2001), available at http://www.fdic.gov/regulations/laws/rules/5000-4650.html#fdic5000psalll.

[10] The FDIC's claim that the Defendants were grossly negligent for failing to book an unspecified amount of reserves for unidentified loans is bizarre because the government regularly pursues criminal and civil penalties against companies and individuals that use such accounting techniques. *E.g., U.S. v. Skilling,* 2006 WL 1155566 (S.D. Tex. Apr. 27, 2006) (federal criminal prosecution for Enron's "cookie-jar reserves"); *Carlson v. Xerox Corp.,* 392 F. Supp. 2d 267 (D. Conn. 2005) (noting SEC investigation and sanctions for "cookie-jar reserves").

Defendant acted in bad faith. *See Oakland County Employees' Retirement Sys.*, 2010 WL 350772 at *5 (dismissing claim based on bonuses paid to officer defendants).

## IV. COUNTS V AND VI FAIL TO ALLEGE THAT THE LOAN COMMITTEE DEFENDANTS WERE NEGLIGENT OR BREACHED THEIR DUTIES.

The Complaint also fails to state a claim against the Loan Committee Defendants for negligence and breach of fiduciary duty. Both of these claims depend upon accepting the false allegation that Defendants should have known from the UBPRs that the CRE program was in trouble by December 1, 2006. As shown above, the FDIC has mischaracterized the UBPRs, which showed *no net loan losses* for the first quarter of 2006 and only a very small 0.30% net loss for the first three quarters of 2006. During the same period, the ALLL was increased by an even greater amount, providing a greater cushion. UBPRs do not support a plausible inference under *Twombly* that the Loan Committee Defendants were negligent or breached their fiduciary duty by continuing the CRE lending program.

As also shown above, the allegations with regard to the ten 2007 loans are almost entirely repetitive boiler plate regarding alleged problems that may or may not have applied to particular loans. The limited specifics that are alleged as to two loans fail to allege whether the Loan Committee Defendants knew about the alleged problems or whether the alleged problems were even knowable at the time. Such vague and sketchy allegations do not meet the minimum standards of *Twombly* and thus Counts V and VI should be dismissed against Saphir and the other Loan Committee Defendants.

## CONCLUSION

For the foregoing reasons, Saphir respectfully requests that the Court dismiss the FDIC's Complaint with prejudice.

20

Dated: January 24, 2011

Respectfully submitted,

 /s/ John M. George, Jr.

John M. George, Jr.
Nancy A. Temple
KATTEN & TEMPLE LLP
542 S. Dearborn St., Suite 1060
Chicago, Illinois 60605
312-663-0800
312-663-0900 (fax)

Counsel for Defendant John M. Saphir