**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Heritage Community Bank,** ) ) ) ) | |
| ) **Plaintiff,** ) | **Case No. 10-07009** |
| **v.** ) ) | **Judge Rebecca Pallmeyer** |
| **JOHN M. SAPHIR; PATRICK G. FANNING; STEPHEN L. FAYDASH; WILLIAM E. HETLER; THOMAS JELINEK; LORI A. MOSELEY; STEPHEN ANTHONY; JERRY C. BRUCER; JAMES K. CHAMPION; ANDREW B. NATHAN; and MARY C. MILLS,** ) ) ) ) ) ) ) ) | |
| **Defendants.** ) | |

---

**PLAINTIFF'S MEMORANDUM IN
<u>OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

I.      The Complaint States Claims Against All Defendants . . . . . . . . . . . . . . . . . . . . .  6

    A.      Defendants Mischaracterize the Applicable Pleading
        Standard, Which Requires Nothing More than Notice
        of a Plausible Right to Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    B.      The Complaint States Claims for Gross Negligence
        Under 12 U.S.C. § 1821(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

        1.      The Complaint States Claims under § 1821(k)
            Against the Director and Loan Committee
            Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

            a.      The Complaint's Gross Negligence
                Allegations Satisfy Rule 8(a)  . . . . . . . . . . . . . . . . . . . . . .  10

            b.      The UBPRs Support the FDIC's Claims . . . . . . . . . . . . . .  13

            c.      The Complaint Does Not Improperly
                Combine Allegations Against Different
                Types of Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

            d.      The Complaint's Allegations Do Not Rest
                on "Hindsight" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

        2.      The Complaint States a Gross Negligence Claim
            Against Faydash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    C.      The Complaint States Claims for Breach of Fiduciary
        Duty and Negligence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

    D.      The Complaint Properly Alleges Proximate Cause . . . . . . . . . . . . . . . . .  21

    E.      The *Caremark* Standard for "Oversight Failure" Is
        Inapplicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

i

II.     The Business Judgment Rule Does Not Support Dismissal
        of Any Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

        A.      Application of the Business Judgment Rule Cannot
                Be Resolved on a Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

        B.      In Any Event, the Complaint Alleges Facts Showing
                Defendants Are Not Protected by the Business
                Judgment Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

                1.      The Business Judgment Rule Does Not Protect
                        Defendants from Liability for Gross Negligence. . . . . . . . . . . . . .     26

                2.      The Complaint Alleges Facts Showing the
                        Director and Loan Committee Defendants'
                        Misconduct Regarding the CRE Lending Program
                        Is Not Covered by the Business Judgment Rule . . . . . . . . . . . . . .     27

                3.      The Complaint Alleges Facts Showing the
                        Director Defendants' and Faydash's Misconduct
                        Regarding Dividend Payments Is Not Covered by
                        the Business Judgment Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     31

                4.      The Complaint Alleges Facts Showing the Director
                        Defendants' and Faydash's Misconduct Regarding
                        Incentive Payments Is Not Covered by the Business
                        Judgment Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

III.    The Heritage By-Laws and Section 5/39(b) of the Illinois Banking
        Act Do Not Warrant Dismissal of Any Claims against the Director
        Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

        A.      The Director Defendants Fail to Establish That the Bank's
                Shareholders Adopted the Narrow Director Liability
                Insulation Permitted by § 5/39(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

        B.      Even If the Director Defendants Had Shown They Were
                Insulated to the Extent Permitted by § 5/39(b), the FDIC's
                Claims Are Outside the Scope of That Statute . . . . . . . . . . . . . . . . . . . . .     38

        C.      In Any Event, § 5/39(b) Does Not Apply to Claims
                Brought by the FDIC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     39

        D.      Faydash and the Loan Committee Defendants, Including
                Saphir and Fanning, Are Not Protected by § 5/39(b) . . . . . . . . . . . . . .     42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     43

## TABLE OF AUTHORITIES

**CASES**                                                                           **PAGE**

*In re Abbott Labs. S'holder Litig.*,
325 F.3d 795 (7th Cir. 2001) ................................................................. 25, 27

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*,
554 F. Supp. 2d 538 (D. Del. 2008) .......................................................... 24

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ............................................................................ 6, 7

*Atherton v. FDIC*,
519 U.S. 213 (1997) ................................................................................ 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................ 6, 7

*Belmont Holdings Corp. v. SunTrust Bank, Inc.*,
1:09-cv-1185-WSD, 2010 U.S. Dist. LEXIS 94569 (N.D. Ga. Sept. 10, 2010) ......... 18

*Brooks v. Ross*,
578 F.3d 574 (7th Cir. 2009) .................................................................... 6, 7

*In re CIT Group, Inc. Sec. Litig.*,
349 F. Supp. 2d 685 (S.D.N.Y. 2004) ........................................................ 20

*In re Caremark International Inc. Derivative Litig.*,
698 A.2d 959 (Del. 1996) ................................................................... 2, 22, 23

*Cat Iron, Inc. v. Bodine Env. Servs., Inc.*,
No. 10-CV-2102, 2010 U.S. Dist. LEXIS 102191 (C.D. Ill. Sept. 28, 2010) ............. 42

*Cement-Lock v. Gas Tech. Inst.*,
523 F. Supp. 2d 827 (N.D. Ill. 2007) ......................................................... 23

*Cordial v. Ernst & Young*,
483 S.E.2d 248 (W. Va. 1996) ................................................................. 41

*Davis v. Dyson*,
387 Ill. App. 3d 676 (1st Dist. 2008) ................................................... 26, 27, 28

*Domanus v. Lewicki*,
No. 08 C 4922, 2011 U.S. Dist. LEXIS 25686 (N.D. Ill. Mar. 14, 2011) ................. 15

*EEOC v. Concentra Health Serv., Inc.*,
496 F.3d 773 (7th Cir. 2007) ........................................................................ 6

*Erickson v. Pardus*,
551 U.S. 89 (2007) ................................................................................. 6, 10

*Fait v. Hummel*,
No. 01 C 2771, 2002 U.S. Dist. LEXIS 4963 (N.D. Ill. Mar. 21, 2002) .......... 26, 33, 34

*FDIC v. Bierman*,
2 F.3d 1424 (7th Cir. 1993) ........................................................................ 13

*FDIC v. Castetter*,
184 F.3d 1040 (9th Cir. 1999) ..................................................................... 25

*FDIC v. Gravee*,
966 F. Supp. 622 (N.D. Ill. 1997) ........................................................ 8, 20, 23

*FDIC v. Greenwood*,
739 F. Supp. 450 (C.D. Ill. 1989) ................................................................ 27

*FDIC v. Mason*,
115 F.2d 548 (3d Cir. 1940) ........................................................................ 33

*FDIC v. Miller*,
781 F. Supp. 1271 (N.D. Ill. 1991) ....................................................... 24, 26, 30

*FDIC v. O'Melveny & Myers*,
61 F.3d 17 (9th Cir. 1995) .......................................................................... 41

*FDIC v. Stahl*,
840 F. Supp. 124 (S.D. Fla. 1993) ................................................................ 21

*FDIC v. Stahl*,
854 F. Supp. 1565 (S.D. Fla. 1994) ............................................................... 18

*FDIC v. Wise*,
758 F. Supp. 1414 (D. Colo. 1991) ............................................................... 11

*Ferris Elevator Co. v. Laharpe Feed & Grain Co.*,
285 Ill. App. 3d 350 (3d Dist. 1996) ....................................................... 28, 30

*HA2003 Liquidating Trust v. Credit Suisse Sec. (USA) LLC*,
517 F.3d 454 (7th Cir. 2008) ...................................................................... 18

*Hall v. Woods*,
325 Ill. 114 (1927) .................................................................................... 32

*Hofeller v. Gen. Candy Corp.*,
275 Ill. App. 89 (1st Dist. 1934) ........................................................................ 32

*Int'l Ins. Co. v. Johns*,
874 F.2d 1447 (11th Cir. 1989) ........................................................................... 35

*King v. Baldino*,
648 F. Supp. 2d 609 (D. Del. 2009) .................................................................... 23

*LeBlanc v. Bernard*,
554 So. 2d 1378 (La. App. 1989) ........................................................................ 41

*Lower v. Lanark Mut. Fire Ins. Co.*,
114 Ill. App. 3d 462 (2d Dist. 1983) ................................................................... 34

*Massa v. Dep't of Registration & Educ.*,
116 Ill. 2d 376 (1987) ..................................................................................... 8, 9

*McRaith v. BDO Seidman, LLP*,
391 Ill. App. 3d 565 (1st Dist. 2009) .................................................................. 41

*Mendelovitz v. Vosicky*,
No. 93 C 937, 1993 U.S. Dist. LEXIS 12936 (N.D. Ill. Sept. 16, 1993) ................. 25

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*,
504 F. Supp. 2d 287 (S.D. Ohio 2007) .............................................. 24, 25, 27, 35

*Ner Tamid Congregation v. Krivoruchko*,
620 F. Supp. 2d 924 (N.D. Ill. 2009) .................................................................. 37

*Nobles v. White County*,
973 F.2d 544 (7th Cir. 1992) .............................................................................. 22

*Noonan v. Harrington*,
No. 09 CV 3191, 2010 U.S. Dist. LEXIS 96800 (C.D. Ill. Sept. 16, 2010) ..... 31, 32, 33

*Oakland County Employees Ret. Sys. v. Massaro*,
No. 09 CV 6284, 2010 U.S. Dist. LEXIS 92648 (N.D. Ill. Sept. 7, 2010) .......... 35, 36

*Ohlendorf v. Rathje*,
230 Ill. App. 427 (1923) .................................................................................... 16

*RTC v. Acton*,
844 F. Supp. 307 (N.D. Tex. 1994) ..................................................................... 16

*RTC v. Bernard,*
No. 2:94-cv-00475, 1995 U.S. Dist. LEXIS 12819 (M.D.N.C. Aug. 8, 1995) ........................... 24

*RTC v. Blasdell,*
154 F.R.D. 675 (D. Ariz. 1993) ........................................................................................ 11

*RTC v. Fortunato,*
No. 94 C 2090, 1994 U.S. Dist. LEXIS 12326 (N.D. Ill. Aug. 31, 1994) ..................................... 9

*RTC v. Franz,*
909 F. Supp. 1128 (N.D. Ill. 1995) .............................................................................. 8, 9

*RTC v. Keefe,*
No. 92-3207, 1993 U.S. Dist. LEXIS 17701 (C.D. Ill. Feb. 19, 1993) ......................... 8, 9, 21, 30

*RTC v. Lucas,*
No. 92-1317, 1993 U.S. Dist. LEXIS 9892 (N.D. Ill. Mar. 25, 1993).................. 21, 24, 26, 28, 30

*RTC v. O'Connell,*
No. 94 C 4186, 1996 U.S. Dist. LEXIS 3999 (N.D. Ill. Mar. 29, 1996) ........................................ 9

*RTC v. Platt,*
No. 92-CV-277-WDS, 1992 U.S. Dist. LEXIS 21377 (C.D. Ill. Oct. 23, 1992).......... 9, 27, 28, 30

*Reynolds v. CB Sports Bar, Inc.,*
623 F.3d 1143 (7th Cir. 2010) ...................................................................................... 21

*Rivera v. Garcia,*
401 Ill. App. 3d 602 (1st Dist. 2010) ............................................................................ 21

*Romanik v. Lurie Home Supply Ctr., Inc.,*
105 Ill. App. 3d 1118 (1982) ........................................................................................ 32

*Rousey v. City of Johnston City,*
No. 05-4174-JPG, 2006 U.S. Dist. LEXIS 7698 (S.D. Ill. Feb. 9, 2006)..................................... 39

*Seidel v. Byron,*
405 B.R. 277 (N.D. Ill. 2009) ....................................................................................... 34

*Sherman v. Ryan,*
392 Ill. App. 3d 712 (1st Dist. 2009) ........................................................................ 23, 25

*Shlensky v. S. Parkway Bldg. Corp.,*
19 Ill. 2d 268 (1960) ............................................................................................. 26, 34

*Stamp v. Touche Ross & Co.,*
263 Ill. App. 3d 1010 (1st Dist. 1993) ...................................................................... 25, 30

*Starrels v. First Nat'l Bank*,
870 F.2d 1168 (7th Cir. 1989) ........................................................................ 25, 31

*Stone v. Ritter*,
911 A.2d 362 (Del. 2006) ................................................................................ 22, 23

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ..................................................................... 7, 11, 19

*Talton v. Unisource Network Servs., Inc.*,
No. 00 C 7967, 2004 U.S. Dist. LEXIS 19300 (N.D. Ill. Sept. 23, 2004) ................................... 25

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ................................................................................. 7

*Treco, Inc. v. Land of Lincoln Svgs. & Loan*,
749 F.2d 374 (7th Cir. 1984) ................................................................................ 34

*Washington Bancorp. v. Said*,
812 F. Supp. 1256 (D.D.C. 1993) .................................................................. 16, 17, 36

## STATUTES AND REGULATIONS

12 U.S.C. § 1821(d) ...................................................................................... 40

12 U.S.C. § 1821(k) ................................................................................ *passim*

205 ILCS § 5/12(a) ....................................................................................... 38

205 ILCS § 5/14(7) ................................................................................... 32, 33

205 ILCS § 5/39(a) ....................................................................................... 40

205 ILCS § 5/39(b) ................................................................................ *passim*

805 ILCS § 5.9/10 ........................................................................................ 33

Fed. R. Civ. P. 8(a) ............................................................................... 1, 10, 11

Fed. R. Civ. P. 23.1 ...................................................................................... 23

12 C.F.R. § 225.4(a) ...................................................................................... 33

*Failure to Act as a Source of Strength to Subsidiary Banks*,
52 Fed. Reg. 15,707 (Apr. 30, 1987) ...................................................................... 33

## INTRODUCTION

On February 27, 2009, Heritage Community Bank, of Glenwood, Illinois ("Heritage" or "the Bank") failed. Unlike the vast majority of its peers, the Bank became dangerously over-concentrated in high-risk commercial real estate ("CRE") loans,[1] and paid extravagant dividends to its holding company, which was owned almost entirely by members of its Board of Directors. The Bank's failure is currently estimated to cost the Federal Deposit Insurance Fund over $40 million.

Acting as Receiver of the Bank, the FDIC brings this case against its former directors and officers responsible for its failure.[2] The Complaint alleges claims for gross negligence under 12 U.S.C. § 1821(k), negligence and breach of fiduciary duty.

Defendants filed six largely overlapping motions to dismiss, quibbling with the FDIC's allegations, invoking inapplicable defenses and legal authority, and broadly disclaiming any responsibility for the Bank's failure.[3] As explained in detail below, Defendants' arguments fail:

- The Complaint states "plausible" claims against all Defendants with far more than the minimal specificity required by Rule 8(a). The Complaint does not conflict with the FDIC's evidence, improperly lump Director Defendants together, implicate the

---

[1]     The Complaint refers to the "CRE Lending Program," which included largely acquisition, development and construction loans.

[2]     Seven Defendants served on the Board of Directors ("Director Defendants"): CEO and Board Chairman John Saphir, Bank President Patrick Fanning, and Board members Andrew Nathan, Jerry Brucer, James Champion, Stephen Anthony and Mary Mills. Six Defendants served on the Loan Committee ("Loan Committee Defendants"): Saphir, Fanning, Nathan, William Hetler, Thomas Jelinek and Lori Moseley. Defendant Stephen Faydash was the Bank's Chief Financial Officer.

[3]     Defendants filed these briefs: Saphir, Dkt. 69 ("Saphir Br."); Anthony and Champion, Dkt. 77 ("A/C Br."); Faydash, Dkt. 82 ("Faydash Br."); Hetler, Jelinek and Moseley, Dkt. 57 ("HJ&M Br."); Mills, Dkt. 79; and Brucer, Dkt. 63. The other Defendants joined in one or more of these briefs.

1

"oversight failure" standard of *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. 1996) or improperly rest on "hindsight." *See infra* § I.

- The business judgment rule raises inherently factual issues that cannot be resolved on a motion to dismiss. In any event, the Complaint alleges that Defendants engaged in conduct not protected by the business judgment rule: all Defendants were grossly negligent, the Director and Loan Committee Defendants approved loans without adequately informing themselves of risks, and Faydash recommended, and the Director Defendants approved, dividends and incentive payments without adequately informing themselves of the Bank's financial condition and to serve their own interests, rather than the Bank's. *See infra* § II.

- The Illinois "director insulating statute," 205 ILCS § 5/39(b), does not protect the Director Defendants. The Director Defendants provide no evidence that the requisite super-majority of Bank shareholders voted to invoke the statute, and even if they had, the FDIC's claims are outside the statute's scope because they: (a) allege gross negligence; (b) allege transactions (dividends and incentive awards) from which the Director Defendants "derived an improper personal benefit"; and (c) are brought by the FDIC as receiver, rather than by Bank shareholders. *See infra* § III.

Defendants' motions should be denied.

## FACTUAL BACKGROUND

The Bank was founded in 1969, and focused on traditional lending, including student and home equity loans. Compl. ¶ 21. In the early 2000s, the Director Defendants caused the Bank to aggressively shift into CRE lending, "a specialized field with unique risks that require thorough understanding and close management." *Id.* ¶ 22. Yet the Director Defendants – who were responsible for ensuring the Bank adequately monitored and controlled risk – launched the CRE Lending Program without seeking any guidance on how to establish, structure, or operate it. *Id.* ¶¶ 22-23. The Directors needed such guidance: none of the outside Director Defendants had any banking experience, and Saphir had no CRE experience; only Director Fanning, the chief CRE

loan originator who was quickly elevated to Bank President, had worked in the area, but his experience was limited. *Id.* ¶¶ 13-17.

As a result, the Director Defendants failed to implement the most basic underwriting and monitoring controls to manage risk in the CRE Lending Program. *Id.* ¶ 23. For example:

- Credit analysts, the first line of defense against poor underwriting, were inexperienced and untrained. They routinely failed to fully analyze the creditworthiness of borrowers and guarantors, and often relied on unverified borrower and guarantor information. *Id.* ¶ 25.

- The credit analysts were not independent and had no practical ability to say "no"; they reported directly to Fanning, the Bank President and chief CRE loan originator. Consequently, the credit analysts' "loan write-ups" and "loan grades," which were given first to the Loan Committee and then to the Board of Directors for approval of each loan, were unreliable and fatally compromised. *Id.* ¶¶ 25-27.

- The Loan Committee and Director Defendants routinely approved loans that exceeded the loan-to-value ("LTV") ratio limits in the Bank's loan policy. In such high-LTV loans, the loan amount was dangerously close to the total future value of the collateral based on an "as completed" appraisal. *Id.* ¶ 29. Examiners repeatedly criticized Heritage's excessive high-LTV loans as exceeding supervisory limits. *Id.* ¶ 30.

- The Loan Committee and Director Defendants routinely approved loans for speculative projects without pre-sales, as well as for projects with defective or incomplete appraisals, or which appraisals did not support. *Id.* ¶¶ 28, 31. Examiners repeatedly criticized Heritage for its non-compliance with regulatory standards for appraisals. *Id.* ¶ 31.

- The Loan Committee and Director Defendants approved risky loans with generous "interest carry" provisions, which meant the Bank, not the borrower, paid interest on the loans during the life of the loan. *Id.* ¶ 32.

- Loan monitoring and tracking procedures were "virtually non-existent." *Id.* ¶ 34. The Bank often did not know if loans were "out-of-balance" (meaning the percentage of funds disbursed exceeded the percentage of project completion), and instead of having borrowers contribute capital to restore balance, kept disbursing loan proceeds. *Id.* ¶ 33. The Bank did not commission a substantive loan review until 2008, when it was on the brink of failure. *Id.* ¶ 34.

Consequently, from the outset of the CRE Lending Program, the Bank's portfolio contained poor quality credits, and Defendants did not mitigate the risks these loans posed with

effective monitoring. To make matters worse, the shift to CRE lending was not gradual; Defendants quickly over-concentrated in this area, allowing CRE loans to triple from 2002 to 2005, and to grow to $178 million by 2006, all without infusing capital or meaningfully strengthening reserves. *Id.* ¶ 38.[4] Heritage also ignored regulatory guidance and examiner criticism warning it to slow growth in this inherently risky lending area. *Id.* ¶¶ 22, 38.

By December 1, 2006, the CRE Lending Program was visibly failing. Increasing numbers of CRE loans were in distress, and in each of the first three quarters of 2006, Heritage's UBPRs[5] showed the Bank in the bottom of its peer group for nonaccrual rates in its CRE loan portfolio. *Id.* ¶ 39; *see also infra* at § I(B)(1)(b). The Director Defendants and CFO Faydash knew, or should have known, that continuing the Bank's CRE lending would worsen the Bank's troubled financial condition. Compl. ¶¶ 3-4, 36-42. But rather than curtailing CRE lending, working out troubled loans, and preserving Bank capital, Defendants tried to mask mounting problems by renewing and extending troubled loans and making additional loan advances. *Id.* ¶¶ 4, 39-42. In addition, Heritage aggressively originated new CRE loans in an effort to grow its way out of its nonaccrual problem,[6] and it failed to record sufficient reserves (known as "Allowance for Loan and Lease Losses," or "ALLL") on CRE loans. *Id.* ¶¶ 36, 40-43. As a

---

[4]     Major risks appeared early in the CRE Lending Program. As Heritage's Uniform Bank Performance Reports ("UBPR") show, as of December 31, 2002, 4.68 percent of the Bank's CRE loans were placed on nonaccrual as compared to 0.13 percent for its peer group, placing the Bank in the bottom four percent of its peer group. *See* Saphir Br., Ex. D at 16 of 32 (Const & Land Dev – 90+ Days P/D – Nonaccrual). (Cites to the UBPRs reference the exhibits to Saphir's brief and to the page number on the upper-right-hand corner of each exhibit. The line of the report referred to is shown in parentheses.)

[5]     The Federal Financial Institutions Examination Council uses information reported in a bank's Quarterly Call Reports to prepare the bank's UBPR.

[6]     As a general matter, banks place loans on "nonaccrual" when a loan payment has not been made for ninety days and cease recording interest income on the loan.

result, the Bank's financial condition was impaired, and it was unable to withstand the significant losses on CRE loans. *Id.*

The worst of these new and renewed loans are listed in paragraph 40 of the Complaint, which identifies the borrower/project, approval date, loan amount, and to-date losses for each credit. These loans were subject to the same underwriting and monitoring deficiencies that marked the CRE Lending Program from the beginning. For instance, the $3.35 million loan to Milovan Valaskovic for a condominium project in an already-condo-saturated Chicago neighborhood had a 95 percent LTV ratio, and its appraisal said it was "not financially feasible." *Id.* ¶ 41; *see also id.* ¶ 42 (detailing another example from the chart in ¶ 40).

At the same time Defendants were betting on a quick turnaround in the real estate market, Faydash recommended, and the Director Defendants approved, $11.075 million in dividends to its parent company, Heritage Community Bancorporation, Inc. ("HCBI"), and incentive award payments. *Id.* ¶¶ 44-45. After December 1, 2006, Faydash and the Director Defendants paid the HCBI (in which they collectively held 73.15 percent of the outstanding stock) $10.2 million in dividends. *Id.* ¶¶ 7-9, 13-17, 44. These dividends dwarfed those paid by peer banks as a percentage of bank equity, and were facilitated by the Bank's generous "interest carry" provisions, which treated Bank-financed interest payments as "income" to the Bank. *Id.* ¶¶ 32, 36, 44. In addition, the Bank paid $875,000 in incentive awards, mostly to Defendants Saphir, Fanning, Faydash, and Jelinek. *Id.* ¶ 45.

With its CRE loan losses mounting and its capital further depleted by excessive dividends and incentive awards, Heritage failed on February 27, 2009. *Id.* ¶ 5.

## ARGUMENT

**I.    The Complaint States Claims Against All Defendants.**

**A.    Defendants Mischaracterize the Applicable Pleading Standard, Which Requires Nothing More than Notice of a Plausible Right to Relief.**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Meeting this standard requires only two things:  giving notice of the claim and alleging facts that show the claim is "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "Notice" does not require much detail; "specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).[7]  A claim is "plausible" so long as "[f]actual allegations . . . raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  These are "easy-to-clear hurdles" (*EEOC v. Concentra Health Serv., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)), particularly because, at the pleading stage, all factual allegations are taken as true and all reasonable inferences are drawn in the plaintiff's favor.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 3949 (2009).

Hetler, Jelinek, and Mosley distort the "plausible" claim requirement.  As those Defendants note, factual allegations that are "just as consistent with lawful conduct as [they are] with wrongdoing" cannot, without more, establish plausibility.  HJ&M Br. at 4 (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).  But that proposition hardly means, as those Defendants argue, that allegations of wrongdoing must *exclude* any innocent explanation or even make it remote; it just recognizes that a complaint relying *entirely* on facts that are equally

---

[7]    Unless otherwise indicated, all citations in this brief omit any internal citations and quotations.

consistent with wrongdoing or innocence (as was the case in *Twombly* and *Brooks*) cannot, by definition, create the requisite "reasonable inference" of liability. *Iqbal*, 129 S. Ct. at 1950.[8] As *Twombly* made clear, "plausible" does not mean "probable"; "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. *See also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (complaint need only establish "a nonnegligible probability that the claim is valid"); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("'Plausibility' in this context does not imply the district court should decide whose version to believe or which version is more likely than not.").

As shown below, the Complaint establishes far more than a "nonnegligible probability" that Defendants were grossly negligent, negligent and breached their fiduciary duties, and that their misconduct caused the Bank's losses and, ultimately, its failure.

**B.     The Complaint States Claims for Gross Negligence under 12 U.S.C. § 1821(k).**

"A director or officer of an insured depository institution may be personally liable for monetary damages" in an action brought by the FDIC "for gross negligence . . . as [that] term [is] defined . . . under applicable State law." 12 U.S.C. § 1821(k). Illinois law defines "gross

---

[8]     In *Twombly*, plaintiff alleged an antitrust conspiracy based entirely on allegations of competitors' "parallel behavior." That fact alone, however, created no inference of "an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free market conduct." *Iqbal*, 129 S. Ct. at 1950 (explaining *Twombly*). Similarly, in *Iqbal*, plaintiff claimed post-September 11 detentions of suspected Al Qaeda associates were unconstitutionally motivated by discrimination against Arabs and Muslims. But the only *fact* plaintiffs alleged to show such intent was the policies' disparate impact on those groups, which alone did not plausibly suggest the policies resulted from "purposeful, invidious discrimination" rather than "nondiscriminatory intent" to investigate and prevent terrorist attacks. *Iqbal*, 129 S. Ct. at 1951-52. *See also Brooks*, 578 F.3d at 581-82 ("[w]ithout more" than allegations of conduct that appeared lawful, plaintiff failed to state "plausible" claim).

negligence" as "'very great negligence, but . . . something less than  . . . willful, wanton and reckless conduct.'"  *FDIC v. Gravee*, 966 F. Supp. 622, 636 (N.D. Ill. 1997) (quoting *Massa v. Dep't of Reg. & Educ.*, 116 Ill. 2d 376 (1987)).[9]  Because deliberate misconduct is not required, "good faith and lack of motive to injure [do not] exonerate [defendants] of liability under the statutory 'gross negligence' standard."  *Gravee*, 966 F. Supp. at 637 (denying bank directors' summary judgment motion on FDIC's § 1821(k) claims).

Courts have routinely denied motions to dismiss § 1821(k) gross negligence claims against officers and directors whose banks failed following uncontrolled growth in speculative, unfamiliar lending areas.  In *Franz*, for instance, defendants plunged their thrift into "out-of-state participation loans for" real estate development even though they lacked "any experience in underwriting, appraising or funding [such loans.]  Despite the inexperience, [the bank] failed to establish appropriate written loan policies and it relied upon information provided and analyzed by a broker" who had originated the loans; in some cases, the bank "performed no independent underwriting or analysis of the mortgages comprising the pool."  *Franz*, 909 F. Supp. at 1130.

Similarly, in *RTC v. Keefe*, No. 92-3207, 1993 U.S. Dist. LEXIS 17701, at *2-5 (C.D. Ill. Feb. 19, 1993), the RTC alleged directors of a failed S&L pushed their institution into a new line of consumer loans and allowed overall consumer lending to grow dramatically, leaving the thrift over-concentrated in consumer debt.  Although "the Board hired someone to oversee the [new] program, [it] did not require him to comply with the Board's automobile lending guidelines."  *Id.* at *2 (denying motion to dismiss § 1821(k) claims).

---

[9]      In *Gravee*, Judge Shadur closely reviewed Illinois law and found that *Resolution Trust Corp.* ["RTC"] *v. Franz*, 909 F. Supp. 1128, 1141 (N.D. Ill. 1995), which equated gross negligence with "recklessness," defined gross negligence too strictly.  966 F. Supp. at 637.

And in *RTC v. Platt*, No. 92-CV-277-WDS, 1992 U.S. Dist. LEXIS 21377 (C.D. Ill. Oct. 23, 1992), the RTC alleged that directors and officers launched a massive "complex, commercial real estate" lending program even though they "lacked the [necessary] experience and expertise." *Id.* at *19. Defendants then failed to "review or analyze financial, credit, or market information before making such loans"; "did not verify information provided by lead lenders and loan brokers"; and failed to "implement prudent appraisal standards." *Id.* at *19-20, 29 (denying motion to dismiss § 1821(k) claims). *See also, e.g., RTC v. O'Connell*, No. 94 C 4186, 1996 U.S. Dist. LEXIS 3999, at *8-9 (N.D. Ill. Mar. 29, 1996) (allegations that defendants "engaged in sophisticated, nationwide lending without proper preparation and failed to install necessary internal controls to make prudent loans"; funded loans "without having obtained important documents such as credit reports and appraisals"; "fund[ed] speculative, non-recourse [real estate] loans without adequate security"; and "len[t] money in excess of the appraisal value of the collateral" stated claims under § 1821(k)); *RTC v. Fortunato*, No. 94 C 2090, 1994 U.S. Dist. LEXIS 12326, at *9 (N.D. Ill. Aug. 31, 1994) (allegations that directors "failed to follow set procedures, violated federal regulations, improperly delegated authority [and] deliberately disregarded certain federal directives" stated claims under § 1821(k)). [10]

---

[10]     Notably, *Franz*, *Keefe*, *O'Connell*, and *Fortunato* found the RTC stated claims under § 1821(k) even when applying a stricter "gross negligence" standard than the current "very great negligence"/"less than willful, wanton and reckless" standard, which Judge Shadur later recognized in *Gravee*, 966 F. Supp. at 636 (following *Massa*, 116 Ill. 2d at 376). *See, e.g.,O'Connell*, 1996 U.S. Dist. LEXIS 3999, at *8 (requiring "recklessness"); *Franz*, 909 F. Supp. at 1141 (requiring "recklessness"); *Fortunato*, 1994 U.S. Dist. LEXIS 12326, at *8 (requiring "willful or wanton misconduct"); *Keefe*, 1993 U.S. Dist. LEXIS 17701, at *4 (requiring "willful and deliberate acts"). Had those cases applied the proper standard set forth in *Gravee* and *Massa*, the sufficiency of the RTC's allegations would have been even clearer.

As shown below, the Complaint properly alleges that the Director Defendants, the Loan Committee Defendants, and Faydash were grossly negligent under the standard developed in the numerous Illinois RTC cases just described.

>1.    **The Complaint States Claims under § 1821(k) Against the Director and Loan Committee Defendants.**

>>a.    **The Complaint's Gross Negligence Allegations Satisfy Rule 8(a).**

As the Factual Background section above explains, the Complaint alleges detailed facts demonstrating the Director Defendants were grossly negligent in three basic respects:

- They plunged the Bank into a specialized and risky new lending area – commercial real estate – without taking any reasonable steps to build adequate underwriting and monitoring safeguards into the program. *See* Compl. ¶¶ 2-3, 23-35.

- In derogation of regulatory criticisms, they allowed the Bank to become dangerously over-concentrated in speculative CRE loans, many with excessive LTV ratios, and failed to keep adequate ALLL reserves or bank capital. *Id*. ¶¶ 29-30, 37-39.  Then, they approved outsized dividends and incentive awards. *Id*. ¶¶ 43-46.

- Along with the Loan Committee Defendants, they voted to approve the ten failed CRE loans identified in the chart in paragraph 40 of the Complaint, which exemplified the Bank's fatally flawed underwriting and monitoring processes. *Id*. ¶¶ 40-42.

Saphir protests the absence of certain details, such as a recitation of exactly "which issues allegedly existed for [each] specific loan at the time of origination" (Saphir Br. at 13), but as the Supreme Court recently affirmed, such "specific facts are not necessary." *Erickson*, 551 U.S. at 93.[11]  Rule 8(a) requires only enough facts to give a fair idea of "what the case is all about and to

---

[11]    Each of Saphir's examples of what is supposedly missing from the Complaint underscores his failure to properly apply Rule 8(a).  For instance, he says the allegations about the invalid pre-sales on the 4518 N. Kedzie LLC loan (Compl. ¶ 42) do not amount to gross negligence because the FDIC fails to "explain how Defendants could have known at the time that

show how, in the plaintiff's mind at least, the dots should be connected." *Swanson*, 614 F.3d at

405. The Complaint does that. It identifies transactions causing damages that the FDIC seeks to

recover and "connects the dots" by identifying numerous facts as to why Defendants' conduct

regarding the transactions was improper.

Saphir cites no case from this Circuit requiring anything more. Instead, he relies on two

cases – *FDIC v. Wise*, 758 F. Supp. 1414 (D. Colo. 1991) and *RTC v. Blasdell*, 154 F.R.D. 675

(D. Ariz. 1993) – that require the kind of detailed fact-pleading the Seventh Circuit rejects. *See,

e.g., Swanson*, 614 F.3d at 405. In any event, the Complaint provides what those two cases

required. *Wise* found that plaintiff could not "reserve the right to offer new transactions in other

submissions, such as a scheduling order" (758 F. Supp. at 1420); here, as just explained, the

FDIC identifies the transactions that caused a loss. *Blasdell* did not even grant a motion to

dismiss. It granted a motion for a more definite statement, requiring detail the Complaint here

alleges about the failed loans, including "the date or dates of each transaction" (Compl. ¶ 40);

"the identity of the [borrowers]" (*id.*); and at least "a brief statement regarding the unsafe or

unsound nature of the transaction[s]" at issue (*id.* ¶¶ 22-42). *Blasdell*, 154 F.R.D. at 690.

Saphir then argues the Complaint fails to allege a plausible right to relief. *See* Saphir Br.

at 10-16. But the FDIC alleges exactly the kind of failures that *Franz*, *Keefe*, *Platt* and the other

cases cited in Section I(A)(1) above found sufficient in the banking context. In arguing

otherwise, Saphir draws unreasonable inferences in his own favor, arguing "it strains credulity to

believe" he would risk bank capital on dodgy loans because he was the Bank's largest

---

the pre-sales would later not pan out when the real estate market ultimately collapsed." Saphir
Br. at 14-15. Rule 8(a) does not require such detail, and in any event, the Complaint does not
allege the pre-sales did not "pan out" because of subsequent events; it alleges they were
"effectively invalid" at the time (Compl. ¶ 42), which comports with its earlier allegation that the
Bank routinely failed to verify pre-sales. *Id.* ¶ 28.

shareholder.  Saphir Br. at 15.  But the Complaint alleges Saphir (and the other Director

Defendants) kept growing the CRE Lending Program after they knew there was a real estate

bubble, and the Bank's CRE concentration was far higher, and its ALLL was far lower, than

those of peer banks.  Compl. ¶¶ 39-43.  It also alleges that the Bank financed interest payments

on even the weakest CRE loans, which Saphir and the other Director Defendants then used to

pay themselves outsized dividends (and in Saphir and Fanning's case, incentive awards).  *Id*.

¶ 32, 36, 44-46.  The Complaint thus raises the reasonable inference that Saphir (and the other

Director Defendants) chose to double-down on risky loans hoping the Bank might grow out of its

problems, or were just taking what they could before the Bank failed, or both.

Similarly, Saphir denies the Complaint raises a reasonable inference that he knew (or was

grossly negligent in not knowing) the Bank's underwriting and monitoring controls for high-

LTV loans were inadequate when he wrote a letter saying the opposite to Illinois banking

regulators, as described in paragraph 30 of the Complaint.  Saphir Br. at 15-16.  But Saphir was

the Bank's Chairman and CEO; the Complaint's extensive allegations about the systemic failures

in the CRE Lending Program (as well as the UBPRs, as explained below) certainly raise a

reasonable inference that he knew (or had no business not knowing) the safeguards were

inadequate.[12]  To the extent Saphir suggests he should be exonerated because the regulators did

not close the Bank after completing the 2006 Report of Examination, he is wrong as a matter of

---

[12]     Anthony and Champion seem to argue Saphir's letter gets them off the hook too, since, they say, they could have reasonably relied on its assurances.  A/C Br. at 15.  But the Complaint doesn't even allege Anthony and Champion saw the letter, and even if it had, the letter's assurances could not exonerate those Defendants as a matter of law, because the Complaint alleges numerous facts showing they failed to adequately inform themselves about the CRE Lending Program, and the information they did have, such as the UBPRs, demonstrated how dangerous it was.

law.  *See FDIC v. Bierman*, 2 F.3d 1424, 1439 (7th Cir. 1993) (regulators owe "no duty" to a

bank to save it from its own directors' and officers' misconduct).

**b.**      **The UBPRs Support the FDIC's Claims.**

Saphir not only fails to take the FDIC's allegations as true, he quarrels with its

interpretation of extrinsic evidence, the UBPRs, which he attaches to his brief.  Saphir Br. at

10-11.  Disputes about that complex evidence, which expert witnesses will likely address in

detail, have no place in a Rule 12(b)(6) motion.  In any event, the UBPRs support the FDIC's

claims.  Saphir does not dispute that the UBPRs show the Bank's net CRE loans losses as of

December 1, 2006 put it in the bottom three to four percent of its peer group; he just argues the

losses, in actual dollars, were not large enough for concern.  *Id.* [13]  On its face, that is a factual

issue that cannot be decided at this stage.  In any event, actual losses were just the tip of the

iceberg; by the end of 2006, CRE loans were increasingly "distressed" and thus on the path to

becoming losses.  *See* Compl. ¶ 39.  The UBPRs Saphir attaches to his brief vividly illustrate this

fact, as well as the Bank's dangerous over-concentration in CRE and lack of sufficient reserves:

- By 2006, CRE loans represented 460.43 percent of the Bank's capital, giving the Bank a higher CRE concentration than all but two percent of its peer group.  Saphir Br., Ex. D at 15 of 32 (Loans & Leases as % of Total Capital – Construction & Development).

- The Bank experienced nonaccrual rates in its CRE loan portfolio significantly higher than its peer group:

---

[13]      Saphir argues the FDIC "mischaracterized" the first quarter of 2006, during which, he says, the Bank had "no net losses" on CRE loans.  Saphir Br. at 20.  But the Complaint alleges only that the UBPRs for the first three quarters of 2006 "showed the Bank in the bottom 3% to 4% of its peer group" for such losses (Compl. ¶ 39), which Saphir's UBPR exhibits show to be true (the Bank had a recovery in the first quarter of 2006 which offset losses).  *See* Saphir Br., Ex. A at 13 of 24 (Net Losses by Type of LN & LS – Construction & Land Development).  And as shown above, the recognized losses were only the beginning of the Bank's problems, given its rapidly mounting past due and nonaccrual CRE loans.

13

| 2006 Quarter | % Nonaccrual | Peer Group % | Percentile Rank |
|---|---|---|---|
| 1st | 1.33% | 0.12% | 91st |
| 2nd | 0.93% | 0.20% | 89th |
| 3rd | 3.12% | 0.18% | 95th |
| 4th | 4.37% | 0.29% | 95th |

Saphir Br., Ex. A at 16 of 34 (Const & Land Dev – 90+ Days P/D – Nonaccrual); Ex. B at 16 of 32 (same); Ex. C at 16 of 34 (same); Ex. D at 16 of 32 (same).

- The Bank's nonaccrual loans as a percentage of total loans increased from 1.39 percent in 2005 to 3.24 percent in 2006, placing it in the bottom two percent of its peer group. By contrast, peer banks saw their nonaccruals rise from only .42 percent in 2005 to .44 percent in 2006. Saphir Br., Ex. D at 17 of 32 (Total LN & LS – 90+ Days Past Due – Nonaccrual).

- In 2006, the Bank's ALLL as a multiple of nonaccrual loans was .34 as compared to a 6.42 multiple for peer banks, placing it in the lowest percentile, *see* Saphir Br., Ex. D at 13 of 32 (LN & LS Allowance to Nonaccrual LN & LS (X)), which means that on a proportional basis, *no bank in Heritage's peer group had as little set aside for losses on nonaccrual loans as Heritage did.*

At the end of the third quarter of 2006, the Bank had $4.5 million in past due CRE loans, and an additional $4.3 million in nonaccrual CRE loans, which, as just shown, was far worse than its peer group. At the same time, the Bank carried only $2.6 million in ALLL on its entire loan portfolio, including those precarious loans, which, as just shown, was also well below its peer group. *Id.* Thus, apart from recognized loan losses, the even bigger problem after the third quarter of 2006 was this massive, and growing, number of past due and nonaccrual loans, which soon became losses and contributed to the Bank's failure.

14

Saphir also disputes the FDIC's allegations that he (and the other Director Defendants) were grossly negligent by failing to ensure the Bank had sufficient ALLL reserves.[14] Saphir argues those allegations are legally inadequate because the FDIC does not allege specific facts proving that applicable Generally Accepted Accounting Principles ("GAAP") were violated. Saphir Br. at 18-19. But such specific proof is not required; the FDIC's allegations about insufficient ALLL are factual and must be taken as true on this motion. *See, e.g., Domanus v. Lewicki*, No. 08 C 4922, 2011 U.S. Dist. LEXIS 25686, at *12 (N.D. Ill. Mar. 14, 2011) (allegation that defendants received stolen funds sufficient without details of transfers – "plaintiffs need not plead evidence"). In addition, unlike in Securities Act or accounting malpractice claims, the FDIC's damages don't flow from the Bank's misstated financial statements; they flow from Defendants' reckless lending and imprudent dividends and incentive awards, which make detailed allegations about GAAP violations unnecessary.

In any event, Saphir misreads the FDIC's allegations of insufficient ALLL. Those allegations do not rest on any failure to establish "cookie jar" reserves or do anything else that applicable standards either forbid or do not require. Rather, they rest on Defendants' failure to prepare for and recognize the losses developing in the CRE loan portfolio, as the UBPRs show.

### c. The Complaint Does Not Improperly Combine Allegations Against Different Types of Directors.

Anthony and Champion argue the FDIC's allegations fail to give "fair notice" because they improperly lump together outside and inside Directors. A/C Br. at 4-8. But by and large,

---

[14]    Saphir's claim that the Bank "prudently increased the ALLL for the [first three quarters of 2006] by $450,000, an amount over one-and-a-half times its net losses on all loans" (Saphir Br. At 4) is a half-truth. Saphir ignores that $279,000 of the "increase" was eliminated by net charge-offs and that even a $450,000 boost to ALLL (let alone the net $171,000) would have been grossly insufficient given the mounting problems in the Bank's CRE portfolio, as the comparison to peer banks above makes clear.

the allegations do not implicate any differences between the two classes of Directors – they acted and voted as a single Board. To the limited extent those differences matter (*e.g.*, inside directors Fanning and Saphir also served on the Loan Committee and received incentive payments), the Complaint recognizes them. *See, e.g.*, Compl. ¶¶ 7, 8, 36, 45. That was not the case in *RTC v. Acton*, 844 F. Supp. 307 (N.D. Tex. 1994). There, plaintiff alleged some directors were "interested" in certain transactions and breached their duty of loyalty, but then failed to "differentiate between interested and disinterested directors." *Id*. at 315 (granting summary judgment).[15]

Anthony and Champion then suggest that the law requires claims against outside and inside directors to be pleaded separately, because the former are supposedly held to some lower standard of care. A/C Br. at 5-6. The authority they cite establishes no such thing. In *Ohlendorf v. Rathje*, 230 Ill. App. 427, 439 (1923), an appeal of a trial verdict, the court divided directors into "classes" only "for the purpose of discussing the [voluminous] evidence as it applies to" them, not pursuant to some special legal requirement. Similarly, while *Washington Bancorp. v. Said*, 812 F. Supp. 1256, 1266 (D.D.C. 1993), stated bank directors "must satisfy different standards of care depending on the circumstances under which they operate," it was not distinguishing between outside and inside directors, but rather between simple and gross negligence (the court had concluded § 1821(k) preempted most, but not all, simple negligence claims; depending on the "circumstances," directors could be subject to one or the other

---

[15] The Complaint does not allege how each Director and Loan Committee Defendant voted on the loans, but that does not deny those Defendants "fair notice" under Rule 8(a). The Complaint identifies the borrower, amount, approval date, and to-date losses for each loan. Compl. ¶ 40. Each Director and Loan Committee member was present for the votes on each loan and ought to know how they voted. If not, they can review the loan files, which the FDIC has already made available to them. Tellingly, no Defendant argues (or could have argued) that they voted against all, or even a majority of, the loans in paragraph 40 of the Complaint.

16

"standard of care"). *Said*, 812 F. Supp. at 1266.[16]  The FDIC website page that Anthony and

Champion cite simply recognizes that outside directors generally have less day-to-day authority

than inside directors; it does not establish a legally binding lower standard of care for outside

directors, let alone sanction the type of risk-blind lending and excessive dividends and incentive

awards those Defendants approved.  *See* http:www.fdic.gov/regulations/laws/rules/5000-

3300.html.

Finally, public policy does not require holding outside directors like Anthony and

Champion to a lower standard of care, let alone warrant dismissal of the FDIC's claims on that

basis.  *See* A/C Br. at 2, 7-8.  While outside directors may not have the same total volume of

duties and responsibilities as inside directors, who serve as both officers and directors, that is no

reason to exempt outside directors from discharging the duties and responsibilities they do have

with the requisite due care.  Otherwise, bank directors – who voluntarily accepted their

responsibilities and are paid fees for their services – would have no incentive to perform

responsibly.  And while Anthony and Champion did not own as much stock in the Bank's

holding company as Saphir did, they owned enough to make the dividends (which totaled

$10.2 million in just the two years before the Bank failed) valuable to them.

### d.    The Complaint's Allegations Do Not Rest on "Hindsight."

The Complaint alleges the Bank's losses resulted from grave problems the Director

Defendants knew or should have known at the time:  systemic defects in the CRE Lending

Program, grossly insufficient reserves (which if properly established would have made dividend

and incentive payments unaffordable), and an over-concentration in CRE.  The Complaint also

---

[16]    In *Atherton v. FDIC*, 519 U.S. 213, 227 (1997), the Supreme Court later rejected the
approach *Said* took, holding that § 1821's "gross negligence standard provides only a floor" and
"does not stand in the way of a stricter standard that the laws of some States provide."

alleges Defendants were "aware of the existence of a real estate bubble," (Compl. ¶ 21), and they had the UBPRs, which, as explained above, showed Heritage had mounting past due and nonaccrual loans, far beyond those of its peer banks, all while its ALLL was far lower than that of its peer banks. The FDIC's allegations that Defendants improperly continued their risky behavior when faced with such warnings do not rest on "hindsight," they establish gross negligence.

Contrast that with *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 1:09-cv-1185-WSD, 2010 U.S. Dist. LEXIS 94569 (N.D. Ga. Sept. 10, 2010), the main case the Director Defendants cite. There, plaintiff claimed SunTrust violated the Securities Act by making false statements about its ALLL and loan losses. *Id.* at *4. But the complaint did "not allege – and specifically disavow[ed] – that SunTrust did not believe" the statements at the time it made them; plaintiff relied *entirely* on SunTrust's subsequent public revision of its ALLL and loan loss numbers. *Id.* at *19. In fact, plaintiff did not even "allege that SunTrust failed to perform a 'detailed analysis' in estimating its ALLL or that SunTrust failed to 'proactively monitor' its loans," which is exactly what the FDIC alleges here. *Id.* at *22.[17]

### 2. The Complaint States a Gross Negligence Claim Against Faydash.

Faydash complains that the FDIC's allegations describing his wrongdoing do not perfectly match the allegations describing his duties. Faydash Br. at 4-5. The language of the Complaint belies this argument, which, in any event, is a minor quibble. The Complaint alleges that Faydash, as CFO, was in charge of the Bank's finances (*see* Compl. ¶¶ 9, 89, 93, 95), and

---

[17]    The other cases the Director Defendants cite were decided after trial and say nothing about how to measure the adequacy of gross negligence allegations. *See HA2003 Liquidating Trust v. Credit Suisse Sec. (USA) LLC*, 517 F.3d 454 (7th Cir. 2008) (affirming trial verdict); *FDIC v. Stahl*, 854 F. Supp. 1565 (S.D. Fla. 1994) (granting directed verdict motion).

18

his alleged wrongdoing related to that responsibility. *See id.* ¶¶ 36, 39, 43-46, 90, 94, 96.

Rule 8(a) does not require any more than that.

Faydash also says the Complaint fails to give fair notice under Rule 8(a) because it is missing certain particulars, like "detail as to the specific loans to which [Faydash] was referring" when he (inaccurately and improperly) told the Board interest income on non-performing loans was not lost, but merely deferred. Faydash Br. at 7 (citing Compl. ¶ 90). This not only misreads the FDIC's allegation – which states Faydash made a general point and was not referring to specific loans – it misapplies Rule 8(a). As explained above, that Rule requires only that a complaint give notice of "what the case is all about and . . . show how, in the plaintiff's mind at least, the dots should be connected." *Swanson*, 614 F.3d at 405.

The Complaint does that. It alleges Faydash was the Bank's CFO, responsible for, *inter alia*, accurately preparing the Bank's financial statements and tax returns and accurately presenting the Bank's financial condition to the Board. Compl. ¶¶ 9, 89, 93, 95. It alleges that in derogation of those duties, Faydash prepared the 2006 financial statements, keeping ALLL at just over one percent of total loans. *Id.* ¶¶ 90, 94, 96. Yet it was clear by that time the Bank was dangerously over-concentrated in CRE loans, experiencing significant past-due and nonaccrual loans, and was well at the bottom of its peer group in ALLL with respect to providing adequate reserves for its troubled loans. *Id. See also* Saphir Br., Ex. D at 13 of 32 (LN & LS Allowance to nonaccrual LN & LS (X)). The Complaint further alleges that by understating the ALLL and failing to increase the Bank's capital to cushion against losses, Faydash was able to recommend payment of excessive dividends and incentive awards that otherwise should not have been paid. Compl. ¶¶ 43, 46, 90, 94, 96. The Director Defendants followed Faydash's recommendations, stripping more than $11 million from the Bank after December 1. *Id.* ¶¶ 43-46. The Complaint

19

alleges those payments contributed to the Bank's failure and seeks to recover them. No further allegations are required.

Faydash then challenges the FDIC's allegations of insufficient ALLL reserves. First, he says setting proper ALLL reserves is a "subjective" matter of "opinion," and that means "[s]tatements regarding the ALLL reserves are only actionable if it is alleged that Faydash did not actually believe that the reserves were adequate." Faydash Br. at 8 (citing *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004)). But the cited passage from *CIT* simply noted that certain public statements about a company's financial position were not "actionable" under the Securities Act because defendants "did not actually believe them to be true." *Id.* The FDIC is not suing Faydash under the Securities Act or for false statements, but rather, for gross negligence in serving as CFO. As shown above, gross negligence allegations do not require such knowing or intentional misconduct. *See Gravee*, 966 F. Supp. at 637 ("good faith and lack of motive to injure [do not] exonerate [defendants] of liability under the statutory 'gross negligence' standard"). In any event, the Complaint raises a plausible inference that Faydash "did not actually believe" the ALLL was adequate; if that issue even mattered, it would have to be resolved at trial.

Next, Faydash echoes Saphir's argument that the Complaint does not adequately allege ALLL reserves were insufficient because it does not contain detailed facts proving violations of GAAP. Faydash Br. at 9-10. As shown above, Rule 8(a) does not require such details; the FDIC's allegation of insufficient ALLL is factual and must be taken as true at this stage. Also, Faydash's quarrel with the allegations is substantively wrong. It rests on the same misreading of the UBPRs that Saphir offers and is refuted in Section (I)(B)(1)(b) above. It also assumes the Bank's "historical analysis of loss rates" (Faydash Br. at 9) that fed into its ALLL calculation

20

was accurate when, as Faydash knows, the year-end 2006 ALLL analysis wrongly excluded all

losses from that year, skewing the results in violation of applicable accounting standards.

Finally, Faydash's statement that ALLL is "entire[ly] backward-focused" (*id*. at 9) is just wrong.

Statement of Financial Standard 5 requires reserves for "loss contingencies," which, as shown

above, were substantial by the third quarter of 2006.[18]  Faydash's challenge to the accuracy of

the FDIC's ALLL allegations should be made at trial, not on a motion to dismiss.

### C.     The Complaint States Claims for Breach of Fiduciary Duty and Negligence.

Because the Complaint properly alleges gross negligence claims against all Defendants, it

necessarily alleges claims for simple negligence and breach of the fiduciary duty of care.  The

only remaining issues on those claims are whether they are defeated by the business judgment

rule or the Illinois bank director insulating statute, 205 ILCS § 5/39(b).  As shown in Sections II

and III below, they are not.[19]

### D.     The Complaint Properly Alleges Proximate Cause.

"[P]roximate cause is preeminently an issue of fact to be decided by the jury."  *Rivera v.*

*Garcia*, 401 Ill. App. 3d 602, 610 (1st Dist. 2010).  *See also Reynolds v. CB Sports Bar, Inc*., 623

F.3d 1143, 1152 (7th Cir. 2010).  Anthony and Champion, as well as Faydash, nonetheless argue

---

[18]      Expert testimony at trial will establish that the Bank's loss severity on impaired CRE
loans at the end of 2006 was 25.53 percent, showing that when CRE loans went bad, they did so
substantially.  Yet the Bank established FAS 5 reserves for non-impaired loans of only
.75 percent, leaving the Bank fatally unprepared for when any of those loans became non-
performing (which they did).

[19]      Contrary to Defendants' arguments, the FDIC's negligence claim is not improperly
duplicative of its breach of fiduciary duty claim.  *See, e.g., RTC v. Lucas*, No. 92-1317, 1993
U.S. Dist. LEXIS 9892, at *3, *22 (N. D. Ill. Mar. 25, 1993) (allowing breach of fiduciary duty
and negligence claims against former S&L officers and directors); *Keefe*, 1993 U.S. Dist. LEXIS
17701, at *6-10 (same); *FDIC v. Stahl*, 840 F. Supp. 124, 125, 129 (S.D. Fla. 1993) (same).
Even if the two claims were duplicative, the FDIC was free to plead them in the alternative under
Fed. R. Civ. P. 8(d)(2).

the Complaint fails to allege they proximately caused the Bank's injuries. A/C Br. at 19; Faydash Br. at 11-13. Anthony and Champion not only presided over the ruinous CRE Lending Program, they voted to approve the loans, dividends, and incentive payments that caused the damages. Proximate causation doesn't get more straightforward than that. Faydash admits the Complaint adequately alleges that he recommended the dividends and incentive payments, but says he did not "cause" the resulting losses because the Director Defendants then voted to approve them. But injuries can have more than one proximate cause. *Nobles v. White County*, 973 F.2d 544, 549 (7th Cir. 1992). The Complaint properly alleges that both Faydash and the Director Defendants played a vital role in causing the Bank to pay improper, excessive dividends and incentive awards.

### E. The *Caremark* Standard for "Oversight Failure" Is Inapplicable.

As shown above, the FDIC properly alleges the Director Defendants were grossly negligent, negligent, and breached their fiduciary duty of care by failing to adequately supervise the CRE Lending Program. Anthony and Champion argue the Director Defendants cannot be liable for that failure unless the FDIC satisfies the demanding "oversight failure" standard established by *In re Caremark Int'l Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996). Not so. *Caremark* defines the requirements for pleading a breach of the fiduciary duty of loyalty – not the duty of care – arising from directors' "inaction" or "oversight failure." *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). The only time a plaintiff needs to plead that claim is in trying to prove demand should be excused in a derivative suit because the directors are "interested"; if a derivative plaintiff cannot show the directors are corrupt, and the underlying misconduct involves "inaction" or "oversight failure," the plaintiff can establish the requisite "interestedness" only by claiming the directors breached their duty of loyalty, which, per

22

*Caremark*, requires allegations showing the directors displayed "conscious disregard for their responsibilities" and failed to act in "good faith." *Id.*

What's more, Rule 23.1, which governs derivative suit pleading, requires all allegations about demand to be pleaded "with particularity." Fed. R. Civ. P. 23.1. That adds up to a substantial pleading burden for derivative plaintiffs who claim "oversight failure" that was sufficiently serious to excuse demand. As *King v. Baldino*, 648 F. Supp. 2d 609, 620 (D. Del. 2009), which Anthony and Champion cite, explains:

> The core of plaintiff's complaint is that defendants breached their fiduciary duty of loyalty as a result of their failure to act, known as a *Caremark* claim, specifically, the board's alleged oversight failure. For defendants to be interested such that demand is excused, there must be a substantial likelihood of liability resulting from their alleged oversight failure.[20]

This case, of course, is not a derivative suit – the FDIC is not acting as a shareholder, but as receiver of the Bank itself – and the demand requirement is inapplicable. The FDIC thus need not claim that the Director Defendants' oversight failure showed a lack of good faith and thereby rose to the level of a breach of the duty of loyalty. The FDIC can simply claim that such failure breached the Directors' duty of care, which is "qualitatively different from, and [less] culpable than," a *Caremark* breach of loyalty claim. *Stone*, 911 A.2d at 370. And as explained in Section I(B) above, the Illinois gross negligence standard similarly does not require a lack of "good faith." *See Gravee*, 966 F. Supp. at 637 ("good faith and lack of motive to injure [do not] exonerate [defendants] of liability under the statutory 'gross negligence' standard"). Further, the

---

[20]     Like *King*, every other case Anthony and Champion cite in support of their *Caremark* argument (pp. 9-11) involved derivative claims, with plaintiffs trying to show demand was excused because the directors' "oversight failure" amounted to a breach of the duty of loyalty. *See, e.g.*, *Cement-Lock v. Gas Tech. Inst.*, 523 F. Supp. 2d 827, 842 (N.D. Ill. 2007); *Sherman v. Ryan*, 392 Ill. App. 3d 712, 728-29 (1st Dist. 2009); *In re Caremark*, 698 A.2d at 965.

23

fact-pleading Rule 23.1 standard is inapplicable here; the FDIC's allegations that the Director Defendants were grossly negligent and breached their duty of care need only satisfy Rule 8(a), which, as shown above, they do.

In any event, the FDIC alleges far more than failure to adequately supervise management, or what the *Caremark* line of cases call "inaction"; it alleges affirmative misconduct, including voting for problem loans and to pay excessive dividends and incentive awards. *See* Compl. ¶¶ 51-52, 58-59, 65-66. Thus, even if the *Caremark* standard applied, which it does not, it would not fully dispose of any of the FDIC's claims and thus would not support dismissal.

## II. The Business Judgment Rule Does Not Support Dismissal of Any Claims.

### A. Application of the Business Judgment Rule Cannot Be Resolved on a Motion to Dismiss.

The business judgment rule provides that "a director [is not] liable for good faith errors in business judgment." *FDIC v. Miller*, 781 F. Supp. 1271, 1277 (N.D. Ill. 1991). Because its application inherently raises fact issues, federal courts routinely deny motions to dismiss based on the business judgment rule. *See, e.g., Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 556-57 (D. Del. 2008) (court will not use "business judgment rule to trigger dismissal . . . under Rule 12(b)(6)"; in federal court, unlike in state court, plaintiff is "not required to plead around the business judgment rule"); *Lucas*, 1993 U.S. Dist. LEXIS 9892, at *15-16 ("business judgment defense is premature" on motion to dismiss; distinguishing cases "dismissed under Illinois fact pleading standards"); *RTC v. Bernard*, No. 2:94-cv-00475, 1995 U.S. Dist. LEXIS 12819, at *41 (M.D.N.C. Aug. 8, 1995) (business judgment rule "inappropriate for consideration on a motion to dismiss"). *See also In re Nat'l*

*Century Fin. Enters., Inc. Inv. Litig.*, 504 F. Supp. 2d 287, 313 (S.D. Ohio 2007) ("plaintiff is not

required to plead [exception to the business judgment rule] with particularity").

Defendants ignore these cases and applicable federal pleading standards.  Instead, they

rely on state court cases, which, unlike the federal cases above, require plaintiffs to plead facts

showing the business judgment rule does not apply.  *See, e.g., Sherman*, 392 Ill. App. 3d at 712;

*Stamp v. Touche Ross & Co.*, 263 Ill. App. 3d 1010 (1st Dist. 1993).  Defendants also turn again

to derivative suit cases, which applied the business judgment rule in determining whether

demand should be excused.  *See, e.g., Sherman*, 392 Ill. App. 3d at 712; *Starrels v. First Nat'l

Bank*, 870 F.2d 1168 (7th Cir. 1989); *Mendelovitz v. Vosicky*, No. 93 C 937, 1993 U.S. Dist.

LEXIS 12936 (N.D. Ill. Sept. 16, 1993).[21]  As discussed above, if a derivative plaintiff cannot

show the directors are corrupt, the only way to excuse demand is to establish that the underlying,

challenged transaction was not protected by the business judgment rule.  Because Federal Rule

of Civil Procedure 23.1 requires derivative plaintiffs to "plead with particularity" reasons why

demand should be excused, derivative complaints must contain "specific allegations to create a

reasonable doubt" that the challenged decision was not protected by the business judgment rule.

*In re Abbott Labs. S'holder Litig.*, 325 F.3d 795, 807 (7th Cir. 2001).  In other words, derivative

plaintiffs thus must plead detailed facts to defeat the business judgment rule.  This is far stricter

than the Rule 8(a) standard applicable here, which, at most, requires allegations creating a

plausible inference that Defendants' conduct was outside the business judgment rule.

---

[21]     Defendants cite other cases that were decided on summary judgment, not on a motion to
dismiss.  *See, e.g., Talton v. Unisource Network Servs., Inc.*, No. 00 C 7967, 2004 U.S. Dist.
LEXIS 19300, at *59-60 (N.D. Ill. Sept. 23, 2004) (denying summary judgment because some
decisions not covered by business judgment rule).  *See also FDIC v. Castetter*, 184 F.3d 1040,
1044 (9th Cir. 1999) (cited by Anthony/Champion; applying California's liberal, statutory
business judgment rule on summary judgment motion).

In short, the authority Defendants cite to support dismissal based on the business

judgment rule is inapplicable, and analysis of the business judgment rule on Defendants' motions

would be "premature" and "[in]appropriate." *See Lucas*, 1993 U.S. Dist. LEXIS 9892, at *16;

*Miller*, 781 F. Supp. at 1278.

> **B.      In Any Event, the Complaint Alleges Facts Showing Defendants Are Not
> Protected by the Business Judgment Rule.**

"The purpose of [the business judgment] rule is to protect directors who have been

diligent and careful in performing their duties from being subjected to liability from honest

mistakes of judgment." *Davis v. Dyson*, 387 Ill. App. 3d 676, 694 (1st Dist. 2008). "[I]t is a

prerequisite to the application of the business judgment rule that the directors exercise due care

in carrying out their corporate duties. If directors fail to exercise due care, then they may not use

the business judgment rule as a shield for their conduct." *Id*. Similarly, the business judgment

rule applies only to actions or decisions that were "solely in the interest of the corporation." *Fait*

*v. Hummel*, No. 01 C 2771, 2002 U.S. Dist. LEXIS 4963 at *16 (N.D. Ill. Mar. 21, 2002)

(quoting *Shlensky v. S. Parkway Bldg. Corp.*, 19 Ill. 2d 268, 278 (1960) ("It is a breach of duty

[and thus outside the business judgment rule] for the directors to place themselves in a position

where their personal interests would prevent them from acting for the best interests of those they

represent.")). Because the Complaint alleges facts showing Defendants acted without "due care"

and, with respect to the dividends and incentive payments, in their own interests rather than

"solely in the interest of" the Bank, the business judgment rule does not support dismissal.

> **1.      The Business Judgment Rule Does Not Protect Defendants from
> Liability for Gross Negligence.**

Allegations showing gross negligence necessarily show the absence of "due care." *See*

*supra* at Section I(B) (defining gross negligence). The business judgment rule is thus

inapplicable "if the directors exhibited gross negligence in breaching their duty of care." *See In re Abbott*, 325 F.3d at 808. *See also In re Nat'l Century*, 504 F. Supp. 2d at 313 ("grossly negligent" directors "not protect[ed]" by business judgment rule). Consequently, the FDIC's gross negligence claims (Counts I, IV and VII) allege misconduct outside the business judgment rule. *See also FDIC v. Greenwood*, 739 F. Supp. 450, 452 (C.D. Ill. 1989) (business judgment rule "presupposes that a director has exercised proper care, skill and diligence"). As shown below, the Complaint alleges facts showing the business judgment rule likewise does not defeat the FDIC's breach of fiduciary duty and negligence claims.

### 2. The Complaint Alleges Facts Showing the Director and Loan Committee Defendants' Misconduct Regarding the CRE Lending Program Is Not Covered by the Business Judgment Rule.

The "business judgment rule is defeated where directors act without becoming sufficiently informed to make an independent business decision." *Davis*, 387 Ill. App. 3d at 694. In *Davis*, for instance, the court refused to dismiss a derivative suit based on the business judgment rule where director defendants failed to take reasonable steps to uncover an embezzlement scheme: "plaintiffs are not merely saying that defendants misjudged the proper safeguards to be taken, as was the case in *Stamp* [the chief case Defendants cite here], but that they failed to obtain the necessary information to make a rational business judgment at all regarding those safeguards." *Id*. at 695. Similarly, in *Platt*, 1992 U.S. Dist. LEXIS 21377, at *19-20, the court refused to dismiss based on the business judgment rule because the RTC alleged "neither the Board nor management made informed judgments" and approved loans "with insufficient and incomplete information about the borrowers, the collateral and the prospects for repayment." Among other things, the RTC alleged that defendants:

27

> lacked the experience and expertise necessary to engage in the sort of complex, commercial real estate lending" [that led to the bank's failure]. . . . [D]espite this lack of expertise, the board failed to establish any written loan policies, procedures, standards or practices to govern its commercial real estate lending activities, nor did it supervise management with respect thereto. . . . [N]either the board nor the staff reviewed or analyzed financial, credit, or market information before making such loans, [and failed to] verify information provided by lead lenders and loan brokers, . . . often rel[ying] upon incomplete and inadequate appraisals provided by the borrower or loan broker requesting credit.

*Id. See also, e.g., Lucas*, 1993 U.S. Dist. LEXIS, at *2-3 (denying dismissal based on business judgment rule; officers and directors pushed S&L into "high risk" real estate lending without "training or experience in underwriting, approving, funding or monitoring [such] loans" and "did not establish written policies, procedures or standards to govern [such] loans, supervise management or comply with regulatory requirements").[22]

This is what the FDIC alleges with respect to the CRE Lending Program. The Director Defendants "had virtually no experience in CRE lending" and "did not consult with anyone with expertise as to how to establish, structure or operate such a program." Compl. ¶ 23. *See also id.* ¶¶ 13-17 (every outside Director Defendant lacked banking background). The Director Defendants then "failed to implement the most basic controls to mitigate the inherent risks in CRE loans." *Id.* ¶ 23. The FDIC thus alleges the Director Defendants "failed to obtain the necessary information to make a rational business judgment" (*Davis*, 387 Ill. App. 3d at 696) about how to structure and operate the CRE Lending Program.

The Complaint likewise alleges that the Director and Loan Committee Defendants "failed to obtain the necessary information to make a rational business judgment" (*id.*) on any particular

---

[22]     *See also Ferris Elevator Co. v. Laharpe Feed & Grain Co.*, 285 Ill. App. 3d 350, 353-54 (3d Dist. 1996) (business judgment rule inapplicable where defendants "did not sufficiently investigate" allegations by state regulatory agency that ultimately led to loss of business license).

CRE loan. The Bank's credit analysts, who should have been "the first line of defense against poor credit decisions," were inexperienced and untrained. Compl. ¶ 24. They ignored or failed to gather key information about borrowers' and guarantors' creditworthiness, as well as about project feasibility, including requiring and verifying pre-sales and adequate appraisals. *Id.* ¶¶ 25, 28. The credit analysts also had no independence – they reported directly to Fanning, the Bank's top officer and CRE loan originator. *Id.* ¶ 26. Consequently, the chief input into the Director and Loan Committee Defendants' loan decisions – the credit analysts' loan write-ups and "loan grades" – were incomplete, unreliable, and fatally compromised.

Finally, the Complaint alleges that the Director Defendants denied themselves critical information before deciding to continue the CRE Lending Program after December 1, 2006. Once loans were made, "tracking procedures were virtually non-existent" and Bank personnel were usually "unaware of whether loans were out of balance." *Id.* ¶¶ 33-34. Defendants did not "commission a substantive, independent loan review to identify weaknesses in [the Bank's] CRE portfolio" until Heritage was on the brink of failure in 2008. *Id.* ¶ 35. *See also id.* ¶¶ 4, 32 (using "interest carry" provisions, Bank paid CRE borrowers' interest payments). This blindness to the true condition of the loan portfolio, and thus to the Bank's larger financial condition, also further compromised the Director and Loan Committee Defendants' individual loan decisions.

Anthony and Champion argue that these defects don't matter because the Bank had a "process in place" for approving loans (credit analysts prepare write-ups and loan grades; Loan Committee, and then the full Board, vote), which, they say, is enough to put the Directors' loan approval votes beyond challenge. A/C Br. at 14. But just because the loan approval process was routinized does not mean it was rational or legitimate. As Anthony and Champion later recognize, the question is not whether *some* process existed, it is whether the process was

29

"deliberately considered in good faith or was otherwise rational." A/C Br. at 12. Similarly, just because directors can, as a general matter, rely on documents prepared by Bank officers and "the advice of financial and legal advisors" does not mean any process involving such documents or advice is necessarily reasonable. *Id*. at 12-13. In any event, the FDIC alleges Defendants failed to get proper advice in structuring the CRE Lending Program and failed to obtain reliable information from the credit analysts before approving individual loans. *See* Compl. ¶¶ 23-28.

Taken together, the FDIC's allegations about the CRE Lending Program are just like those in *Platt* and more than enough to raise a plausible inference that Defendants are unprotected by the business judgment rule on the FDIC's negligence and breach of fiduciary duty claims. *See Platt*, 1992 U.S. Dist. LEXIS 31277, at *19. *See also, e.g., Ferris Elevator*, 285 Ill. App. 3d at 356 ("[w]hether the decision made by the directors was an informed one . . . appropriately left to the jury"); *Lucas*, 1993 U.S. Dist. LEXIS 9892, at *15-16 (denying motion to dismiss based on business judgment rule because, unlike in *Stamp*, plaintiff "alleges *inter alia* that the Defendants breached a duty to make informed judgments"); *Miller*, 781 F. Supp. at 1278 (denying dismissal based on business judgment rule where plaintiff alleged defendant "did not perform her duties with care and diligence"); *Keefe*, 1993 U.S. Dist. LEXIS 17701, at *6 (denying dismissal based on business judgment rule where plaintiff alleged directors presided over unchecked growth in consumer lending portfolio without adequate supervision or controls).

This case is nothing like *Stamp*, where the complaint was devoid of any allegations that "defendants did not make informed judgments or use due care in arriving at those judgments." 263 Ill. App. 3d at 1017. And it is completely distinct from *Sherman*, a derivative suit where the shareholders failed to allege the director defendants did anything to implement or facilitate an "'illegal business plan'" pursued by certain officers; rather, the director defendants merely failed

30

to stop it. 392 Ill. App. 3d at 727 (applying Illinois fact-pleading standards and strict Delaware demand-excused requirements). Here, by contrast, the Director Defendants not only implemented, oversaw, and approved the CRE Lending Program, they, along with the Loan Committee Defendants, made merits-based decisions to approve the loans. *See* Compl. ¶¶ 40-42.[23] The FDIC's allegations regarding the CRE Lending Program are not subject to the business judgment rule.

### 3. The Complaint Alleges Facts Showing the Director Defendants' and Faydash's Misconduct Regarding Dividend Payments Is Not Covered by the Business Judgment Rule.

As just shown, the Complaint alleges facts demonstrating the Director Defendants failed to ensure that anyone at the Bank adequately tracked or monitored CRE loans, depriving all Defendants of vital information about the health of the Bank's CRE loan portfolio, and thus its overall financial condition. As a result, neither Faydash nor the Director Defendants were adequately informed about what level of dividend payments the Bank could afford to pay and failed to use "due care" in recommending and approving disproportionately large dividends after December 1, 2006. For that reason alone, the business judgment rule is no defense to the FDIC's dividend payment allegations against those Defendants.

Anthony and Champion try to read the "due care" requirement out of the business judgment rule as applied to dividend payments, arguing that directors' dividend decisions are protected so long as they are made "in good faith and in honesty of purpose." A/C Br. at 17-18 (quoting *Noonan v. Harrington*, No. 09 CV 3191, 2010 U.S. Dist. LEXIS 96800, at *11-12 (C.D.

---

[23] Nor is this case like *Starrels*. Plaintiffs there were subject to the demanding Rule 23.1 fact pleading standard and failed to specifically identify why the directors were too uninformed to make reasonable decisions. *See* 870 F.2d at 1172. As just explained, the FDIC alleges such facts in detail.

Ill. Sept. 16, 2010)).  But even if *Noonan* and the cases it cites excluded "due care" from the

business judgment rule calculus on the facts before them – which, as shown below, they did not

– those cases would be inapplicable here.

First, those cases involved *refusals* to pay dividends, or, as *Noonan* put it, "[t]he choice to

maintain a large cash surplus."  *Id*.  That is the "choice" that *Noonan* said was protected by the

business judgment rule "'so long as it is exercised in good faith and honesty of purpose.'"  *Id*.

(quoting *Hall v. Woods*, 325 Ill. 114, 140 (1927)).  *See also Hofeller v. Gen. Candy Corp.*, 275

Ill. App. 89, 96-97 (1st Dist. 1934) (cited by Anthony/Champion; rejecting challenge to refusal

to pay dividend).[24]  It makes sense to protect that "choice" because retaining cash almost never

harms a corporation; it's problematic only if the directors withhold dividends to purposely harm

other shareholders, *i.e.*, if they act without "good faith or honesty of purpose."  No such

deference is due here because the situation is just the opposite:  The Director Defendants and

Faydash failed to "maintain a large cash surplus" and paid grossly excessive dividends to

themselves, leading to the Bank's collapse.

Second, *Noonan* and cases it cites involved ordinary corporations, not banks.  Because

failure of a bank, unlike the failure of an ordinary corporation, imposes huge public costs, the

Illinois Banking Act restricts bank dividends.  A bank "shall not withdraw, or permit to be

withdrawn, either in the form of dividends or otherwise, any portion of its capital."  205 ILCS

§ 5/14(7).  Further:

> No dividends shall be paid by a state bank while it continues its
> banking business to an amount greater than its net profits then on
> hand, deducting first therefrom its losses and bad debts.  All debts

---

[24]     *See also Romanik v. Lurie Home Supply Ctr., Inc.*, 105 Ill. App. 3d 1118, 1134 (1982)
(rejecting challenge to refusal to declare dividend; business judgment rule protects dividend
decision "where a legal dividend fund is available").

> due to a state bank on which interest is past due and unpaid for a
> period of 6 months or more, unless the same are well secured and
> in the process of collection, shall be considered bad debts.

205 ILCS § 5/14(8)(b).  Applicable regulatory and policy guidance also limit bank dividends.

Regulation Y of the Bank Holding Company Act provides that holding companies "shall serve as

a source of financial and managerial strength to its subsidiary banks."  12 C.F.R. § 225.4(a).  An

official Policy Statement from the Governors of the Federal Reserve Board likewise recognizes

that a "strong capital cushion also limits the exposure of the federal deposit insurance fund to

losses experienced by bank institutions."  *Failure to Act as a Source of Strength to Subsidiary*

*Banks,* 52 Fed. Reg. 15,707 (Apr. 30, 1987).

 These requirements foreclose any possibility that the business judgment rule calculus on

bank dividends involves only "good faith and honest purpose" and does not require exercise of

"due care."  *See also FDIC v. Mason*, 115 F.2d 548, 550-51 (3d Cir. 1940) (directors violated

duty of "ordinary care" by declaring dividend based on calculations of bank officers that were

not checked by independent auditor).

 In any event, even *Noonan* recognizes that general corporate dividends are governed by

805 ILCS § 5.9/10.  *Noonan*, 2010 U.S. Dist. LEXIS 96800, at *11.  That provision has, in

essence, its own "due care" component, as it requires dividends to rest on "accounting practices

and principles that are reasonable in the circumstances."  805 ILCS § 5/9.10.  The Complaint

alleges facts showing Faydash and the Director Defendants did not meet that standard because

the Bank's "accounting practices and principles," particularly the understatement of ALLL and

failure to monitor CRE loans, were fundamentally unreasonable.  *See, e.g.*, Compl. ¶¶ 43-44.

 Finally, even beyond "due care," the business judgment rule is inapplicable to the

dividend payments because they were not made "'solely in the interest of the [Bank].'"  *Fait*,

33

2002 U.S. Dist. LEXIS 4963, at *16-17 (quoting *Shlensky*, 19 Ill. 2d at 278) (denying summary judgment on business judgment rule because "reasonable factfinder could conclude [that defendants] sabotaged a more lucrative financing option to serve their own self-interests").[25] *See also Seidel v. Byron*, 405 B.R. 277, 290 (N.D. Ill. 2009) (denying motion to dismiss based on business judgment rule; rule inapplicable if director "appear[ed] on both sides of a transaction or . . . derive[ed] a personal benefit from" it); *Lower v. Lanark Mut. Fire Ins. Co.*, 114 Ill. App. 3d 462, 468 (2d Dist. 1983) (reversing summary judgment; record raised reasonable inference that directors approved settlement "to cover up their prior wrongdoing and insulate them from the attendant liability at the expense of the company").[26]

Faydash and the Director Defendants were HCBI shareholders. By recommending and approving over $10.2 million in dividends in the two years leading up to the Bank's failure, those Defendants paid themselves money the Bank sorely needed to absorb significant losses on CRE loans. *See* Compl. ¶ 44. These payments dwarfed dividends paid by similar banks; in 2006 alone, dividends were more than 25 percent of total Bank equity, over four times the average paid by peer group banks. *Id.* The Complaint thus raises a plausible inference that these dividend payments were not "solely in the interests of the Bank" so as to be covered by the business judgment rule. If Faydash and the Director Defendants want to contest that conclusion, or argue that the dividends were nonetheless reasonable, they should do so at trial.

---

[25] A less stringent standard – protecting directors unless self-interest was the "sole or primary purpose" of the transaction – governs application of the business judgment rule to "the issue of director liability for conduct defending against a takeover and liquidation threat." *Treco, Inc. v. Land of Lincoln Svgs. & Loan*, 749 F.2d 374, 379 (7th Cir. 1984). Outside that narrow context, the business judgment rule is available only if defendants act "solely in the interest of the corporation." *Fait*, 2002 U.S. Dist. LEXIS 4963, at *16.

[26] This is equivalent to the "good faith and honesty of purpose" standard in *Noonan*.

4.    **The Complaint Alleges Facts Showing the Director Defendants' and Faydash's Misconduct Regarding Incentive Payments Is Not Covered by the Business Judgment Rule.**

The incentive payments were outside the business judgment rule for the same reason as the dividends: Faydash recommended them, and the Director Defendants approved them, without "due care" because they had blinded themselves to the Bank's true financial condition, and the payments were not "solely in the interest of the Bank." Faydash recommended these payments, and Saphir and Fanning voted to approve them, even though those Defendants were the chief recipients.[27]

Again, Anthony and Champion argue that a different, more forgiving, standard governs application of the business judgment rule to Directors' approval of the incentive payments. A/C Br. at 16-17. These Defendants say the incentive payments were "executive compensation" decisions, protected by the business judgment rule unless they constitute corporate waste. *See* A/C Br. at 16. But the two cases cited for that proposition involved ordinary corporations, not banks, and the "executive compensation" in those cases did not imperil the company's survival; plaintiffs merely disputed the value received from the executives. *See Int'l Ins. Co. v. Johns*, 874 F.2d 1447 (11th Cir. 1989); *Oakland County Emp. Ret. Sys. v. Massaro*, No. 09 CV 6284, 2010 U.S. Dist. LEXIS 92648 (N.D. Ill. Sept. 7, 2010). These cases don't justify expanding the business judgment rule beyond its ordinary boundaries here.

In any event, whether payments amount to waste is a fact question; that's why *Johns*, the chief case Anthony and Champion cite, was decided after a bench trial. *See Johns*, 874 F.2d at

---

[27]    The business judgment rule does not protect the other Director Defendants from liability for voting to approve these interested transfers to Faydash, Saphir, Fanning, and Jelinek. *See In re Nat'l Century*, 504 F. Supp. 2d at 313 ("business judgment rule does not protect a director who fails to attempt to prevent waste or self-dealing, of which the director should have known, was being committed by another corporate officer").

1450.  While the other case, *Massaro*, was dismissed under Rule 12(b)(6), that was because "plaintiffs conced[ed] that the challenged bonuses appeared to be 'justified . . . at the time'" they were approved; the *sole* fact plaintiffs alleged supporting its "waste" allegation was "the *ex post* revelation" – based on a restatement of earnings – "that executive bonuses were higher than they ought to have been."  2010 U.S. Dist. LEXIS 92648, at *16.  By contrast, the FDIC alleges that at the time Defendants approved the incentive payments, "it was apparent that the CRE Lending Program was failing, the ALLL was insufficient, and the Bank's capital was inadequate to provide a cushion against losses in its CRE loan portfolio."  Compl. ¶ 46.  The FDIC also alleges facts showing the incentive payments were otherwise undeserved – the payments rewarded Saphir, Fanning, Faydash, Jelinek, and Hetler after December 1, 2006, when the CRE Lending Program was failing and should have been shut down.  *Id.* ¶¶ 39, 46.

Anthony and Champion also try to hide behind Faydash's recommendation of the incentive payments, arguing that compensation decisions based on "reports and advice from the company's officers" are, in effect, *per se* protected by the business judgment rule.  A/C Br. at 17.  But Faydash received incentive payments; the Directors can't immunize themselves by relying on his interested recommendation.  *See* Compl. ¶¶ 9, 45 (Faydash was a shareholder and an officer who received incentive payments).  The only case Anthony and Champion cite, *Said*, 812 F. Supp. at 1271, does not help them.  It granted summary judgment because the allegations and evidence showed that "[a]ll defendants were familiar with [the bank's] operations, met regularly, and received advice from counsel and advisors."  *Id.*  As shown above, the FDIC alleges that the Director Defendants failed to ensure they had anywhere close to a sufficient grasp of the Bank's CRE Lending Program or overall financial condition before voting to approve the incentive

payments. And nothing in *Said* suggests the officers giving "advice" about the disputed

payments in that case stood to receive such payments themselves, as Faydash did here.

## III.    The Heritage By-Laws and Section 5/39(b) of the Illinois Banking Act Do Not Warrant Dismissal of Any Claims against the Director Defendants.

The Director Defendants and Faydash argue that a document they identify as the Bank's

by-laws insulates them from liability on the FDIC's breach of fiduciary duty and negligence

claims, and that § 5/39(b) of the Illinois Banking Act, 205 ILCS § 5/39(b) ("§ 5/39(b)") permits

such insulation. As shown below, the by-laws document Defendants submit cannot establish any

liability insulation, and § 5/39(b) does not cover the FDIC's claims, both because of the

misconduct alleged and the particular role of the FDIC. And because Faydash, Hetler, Jelinek

and Moseley were officers but not directors, and Saphir and Fanning are sued both as directors

and officers/Loan Committee members, those Defendants can't claim protection under § 5/39(b).

### A.    The Director Defendants Fail to Establish That the Bank's Shareholders Adopted the Narrow Director Liability Insulation Permitted by § 5/39(b).

Section 5/39(b) states that "[b]y the affirmative vote of the holders of at least two-thirds

of the outstanding shares of stock of a State bank . . . a State bank may establish that a director is

not personally liable to the bank or its shareholders for monetary damages for breach of the

director's fiduciary duty." The Director Defendants do not even contend, let alone establish, that

such a shareholder vote occurred.[28] Instead, they invoke § 5/39(b) based on Article X of a

document they identify as the Bank's by-laws. *See* Saphir Br. at 8-9; Ex. F. The submitted

---

[28]    The FDIC has not seen evidence that such a shareholder vote occurred. The relevant evidence, if it exists, would be in the records of the Bank's parent company, HCBI, to which the FDIC has not had access. Neither Saphir (nor any other Director Defendant) should be allowed to submit such evidence with their reply briefs. *See Ner Tamid Congregation v. Krivoruchko*, 620 F. Supp. 2d 924, 929 (N.D. Ill. 2009) ("Reply briefs are for replying, not for raising new matters or arguments that could and ought to have been advanced in the opening brief.").

document, however, does not indicate it was adopted or approved by anyone, and as the document itself makes clear, if anyone had adopted it, it would have been the Bank's Board of Directors (by simple majority), not a super-majority of its shareholders.  *See* Saphir Br., Ex. F at 13 (majority of Board may amend or repeal by-laws).  *See also* 205 ILCS § 5/12(a)(3) (by-laws to be adopted by bank board of directors).  Because the Director Defendants failed to offer any proof that the Bank's shareholders, let alone holders of "at least two-thirds" of such shares, voted to insulate the Bank's directors, § 5/39(b) does not support dismissal.

**B.**      **Even If the Director Defendants Had Shown They Were Insulated to the Extent Permitted by § 5/39(b), the FDIC's Claims Are Outside the Scope of That Statute.**

While § 5/39(b) permits insulation for claims of breach of fiduciary duty, it contains numerous exceptions, including for:  "an act or omission that is grossly negligent" (§ 5/39(b)(1)), "a breach of the duty of loyalty to the bank or its shareholders" (§ 5/39(b)(2)), and "a transaction from which the director derived an improper personal benefit" (§ 5/39(b)(4)).  The Director Defendants do not dispute that the first exception covers Count I (alleging violation of 12 U.S.C. § 1821(k), which allows the FDIC to recover for gross negligence).  As explained below, Counts II and III, for negligence and breach of fiduciary duty, are also excluded from insulation by other exceptions in § 5/39(b).

Count II claims negligence, which is not included in the scope of § 5/39(b); on its face, that section permits insulation only for claims of "breach of fiduciary duty."  205 ILCS § 5/39(b).  In any event, Counts II and III claim, in part, that the Director Defendants were negligent and breached their fiduciary duty by approving dividend payments to themselves (as HCBI shareholders), even though the Bank could not afford to pay them.  *See* Compl. ¶¶ 59, 66. Those counts also claim that Saphir, Fanning and Faydash were negligent and breached their

fiduciary duty by recommending or approving improper incentive payments to themselves. *Id.* Counts II and III thus allege "transaction[s] from which the director[s] derived an improper personal benefit" and that the Director Defendants breached their "duty of loyalty to the bank," and to that extent, the exceptions in §§ 5/39(b)(2) and (4) preclude insulation. Similarly, to the extent any conduct targeted by Counts II and III was "grossly negligent" – which the FDIC alleges it was – it falls under the exception in § 5/39(b)(1). This means that insulation under § 5/39(b), even if available, would not extend to the full scope of the FDIC's negligence and breach of fiduciary duty claims. Accordingly, Counts II and III cannot be dismissed on this basis. *See Rousey v. City of Johnston City*, No. 05-4174-JPG, 2006 U.S. Dist. LEXIS 7698, at *13, n.4 (S.D. Ill. Feb. 9, 2006) (motion to dismiss must dispose of entire claim).

### C.    In Any Event, § 5/39(b) Does Not Apply to Claims Brought by the FDIC.

Whether § 5/39(b) should apply to claims brought by the FDIC as receiver is an issue of first impression. The language and logic of the statute, as well as analogous case law, demonstrate that it should not.

So long as a bank is solvent, insulation under § 5/39(b) is a matter purely between the shareholders and the directors. Because a solvent bank can, by definition, pay its creditors, the shareholders would bear the full brunt of any damage caused by a director's breach of fiduciary duty. By insulating directors pursuant to § 5/39(b), bank shareholders are simply agreeing to limit their own right to recover against directors for breach of fiduciary duty. Indeed, to the extent the directors are, like the Director Defendants here, also shareholders (*see* Compl. ¶¶ 7-8, 13-17), an insulating resolution reflects only the shareholders' decision to protect themselves.

But once a bank is insolvent and the FDIC is installed as receiver, the damage caused by directors' derelictions is borne not just by the shareholders, but by innocent third parties,

particularly the Federal Deposit Insurance Fund and other creditors whose interests the FDIC is statutorily obligated to protect.[29]  *See* 12 U.S.C. § 1821(d)(2)(A).  These third parties never agreed to any liability limitation and shouldn't have to suffer the consequences of the bank shareholders' decision to insulate the directors, particularly where, as here, the shareholders were themselves directors.

In addition, subsection 5/39(b), permitting insulation from liability "to the bank or its shareholders," must be read together with subsection 5/39(a).  That subsection establishes that directors (and officers) may be liable to "the State bank, its stockholders, *or any other person*" for violations of certain Illinois Banking Act sections.  205 ILCS § 5/39(a) (emphasis added).  Such "other persons" would include depositors and creditors, the very interests for whose benefit the FDIC is suing here.  *See* 12 U.S.C. § 1821(d)(2)(A).  While the FDIC is not alleging violation of the Illinois Banking Act, § 5/39's clear distinction between the scope of director liability (which includes "other persons") and the scope of potential director insulation (which is limited to "the bank and its shareholders") shows that "the bank" as used in § 5/39(b) should be construed narrowly to exclude claims brought by the FDIC as receiver.

---

[29]     Under the priority scheme in 12 U.S.C. § 1821(d)(11)(A)(v), shareholders stand at the back of the line.  To the extent insulation under § 5/39 survives after a bank fails, it should apply only to claims against the Bank's estate by the shareholders who voted to insulate the directors.

40

Finally, extensive case law in analogous contexts supports the FDIC's position. These cases show that receivers acting pursuant to comprehensive regulatory schemes designed to serve the public interest are not subject to defenses that, like the insulating statute, would unreasonably or inequitably bar recovery of what have become public losses. In *FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir. 1995), for instance, the court rejected a law firm's equitable defenses to a suit brought by the FDIC as receiver:

> While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law. . . . [T]he receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets.

*Id.* at 19.

Similarly, the Illinois Court of Appeals held that an accounting firm could not impute an insolvent insurance company's wrongdoing to the Illinois Insurance Director when he was acting as the company's statutorily appointed liquidator. *See McRaith v. BDO Seidman, LLP*, 391 Ill. App. 3d 565, 595-96 (1st Dist. 2009). The court explained "[t]his decision is supported by Illinois law and public policy that vests the Liquidator with the statutory authority to liquidate the property, business and affairs of the insolvent insurance company in order to protect policyholders and creditors from the type of misconduct which occurred here." *Id. See also Cordial v. Ernst & Young*, 483 S.E.2d 248, 257 n.9 (W. Va. 1996) (rejecting argument that insurance company receiver's rights "rise no higher than those of the corporations they represent" because receiver "vindicat[es] the rights of the public, including the [company's]

41

creditors, policyholders, providers, members and subscribers"); *LeBlanc v. Bernard*, 554 So.2d 1378, 1381 (La. App. 1989) (trial court erred "as a matter of law" by placing insurance company rehabilitator "in the exact shoes" of company; insurance industry is "affected with the public interest" and rehabilitator or liquidator "owes an overriding duty to the people of the State").

The only cases any Director Defendant cites in arguing for application of § 5/39(b) arose outside the receivership context, and thus do not support subjecting the FDIC to any insulation agreement here. *See* Saphir Br. at 9. In fact, one of those cases expressly recognizes that agreements to limit liability are construed more narrowly "in contracts involving publicly regulated activities." *Cat Iron, Inc. v. Bodine Env. Servs., Inc.*, No. 10-CV-2102, 2010 U.S. Dist. LEXIS 102191 at *6-7 (C.D. Ill. Sept. 28, 2010) ("Illinois Supreme Court decisions have consistently reflected a judicial concern with balancing the need to respect the right to freely contract with the need to protect parties from unfair provisions in contracts involving publicly regulated activities."). Banking is as "publicly regulated" an activity as there is, and for the reasons just explained, insulating the Director Defendants from liability to the FDIC based on a contract they entered with themselves would be fundamentally "unfair." *Id.*

Thus, even if the Director Defendants had shown that two-thirds of Heritage's shareholders voted to insulate them from breach of fiduciary duty claims to the extent allowed by § 5/39(b) and the FDIC's claims did not fall into that statute's express exclusions, insulation should still be unavailable in this case.

### D. Faydash and the Loan Committee Defendants, Including Saphir and Fanning, Are Not Protected by § 5/39(b).

Faydash asserts that if the Court rejects his other arguments, he "should be afforded the 'director defenses' provided by" § 5/39(b), and Hetler, Jelinek and Moseley argue the same.

42

Faydash Br. at 15; HJ&M Br. at 12.  But § 5/39(b) expressly limits insulation to "directors" and nowhere suggests it could extend to "officers."  Section 5/39(a), by contrast, applies to "[e]very director or officer of a State bank," and the title of the entire section is "Directors' and Officers' Liability."  If the Illinois General Assembly wanted § 5/39(b) to apply to officers as well as directors, it would have said so.  Because Faydash, Hetler, Jelinek and Moseley were officers, not Directors, of the Bank, they are not insulated from liability under §5/39(b).  *See* Compl. ¶¶ 9-12 (describing those Defendants' positions).

The same goes for Saphir and Fanning.  In addition to being Directors, Saphir was the Bank's CEO and Fanning was its Senior Vice President and Chief Lending Officer, and both sat on the Bank's Loan Committee.  *See* Compl. ¶¶ 7, 8.  While the FDIC sues Saphir and Fanning for certain conduct committed in their capacity as Directors (chiefly, "failing to supervise management in the design, implementation and operation of the CRE Lending Program" and approving loans, dividends and incentive payments (*id*. ¶¶ 50-52)), it also sues them as Loan Committee members, challenging their approval of bad CRE loans.  *Id*. ¶¶ 69-86.  Thus, even if § 5/39(b) insulated Saphir and Fanning from liability in their capacity as Directors (which, as explained above, it does not), it would not protect them from liability on Counts IV through VI, which challenge their conduct as Loan Committee members.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied.

Respectfully submitted,

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Heritage Community Bank**

Dated: March 18, 2011

/s/ Susan Valentine
One of its Attorneys

Susan Valentine (ARDC No. 6196269)
Robert S. Michaels (ARDC No. 6203462)
Megan O'Malley Chessare (ARDC No. 6293492)
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Facsimile
svalentine@robinsoncurley.com
rmichaels@robinsoncurley.com
mchessare@robinsoncurley.com

Leonard J. DePasquale
FEDERAL DEPOSIT INSURANCE CORPORATION
3501 North Fairfax Drive, VS-E-7016
Arlington, Virginia 22226
(703) 562-2063 – Telephone
ldepasquale@FDIC.gov

44

## <u>CERTIFICATE OF SERVICE</u>

     Susan Valentine, an attorney, hereby certifies that on March 18, 2011, she caused to be filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, **Plaintiff's Memorandum in Opposition to Defendants' Motions to Dismiss**, using the Court's ECF system, which shall send notification of such filing to all counsel of record.


     /s/ Susan  Valentine